NOTICE

Decision filed 08/23/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180476-U

NO. 5-18-0476

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 16-CF-117 |
| | ) | |
| TRAVIS TYLER, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The defendant's conviction for first degree murder based on felony murder is affirmed where the predicate felonies were not inherent in the murder and were committed with an independent felonious purpose, his counsel was not ineffective for failing to call certain witnesses as a matter of trial strategy, his counsel was not ineffective for failing to offer a jury instruction on the defense of others or on justified use of force, his constitutional rights were not violated when his counsel was denied the opportunity to cross-examine the State's witness about the witness's expectation of leniency concerning a pending criminal case, the trial court did not abuse its discretion in admitting pictures posted on the defendant's Snapchat story as they were relevant, and the court did not abuse its discretion in refusing to allow his counsel to ask certain questions about transferred intent to the potential jury members during *voir dire*. The defendant's 60-year sentence is also affirmed where he was sentenced to a mandatory sentencing enhancement and where the court properly considered the factors in aggravation and mitigation.

¶ 2    During the March 2018 jury trial, the defendant, Travis Tyler, was convicted of two

counts of first degree murder based on felony murder (counts I and II) (720 ILCS 5/9-1(a)(3)

1

(West 2016)), one count of aggravated battery with a firearm (count III) (*id.* § 12-3.05(e)(1)), and two counts of aggravated discharge of a firearm (counts IV and V) (*id.* § 24-1.2(a)(1)). Thereafter, the trial court sentenced him to a total of 85 years' imprisonment, ordering consecutive sentences on counts I, III, IV, and V. In July 2018, the defendant filed a motion to vacate the lesser-included convictions for aggravated battery with a firearm and aggravated discharge of a firearm and to reconsider his sentence because those offenses were the predicate felonies underlying the felony murder charge. In September 2018, after the State conceded that the convictions on the predicate felonies should be vacated, the trial court vacated the defendant's convictions for aggravated battery with a firearm and aggravated discharge of a firearm. This left the defendant with a 60-year sentence, which included a 35-year sentence for first degree murder and a 25-year mandatory sentencing enhancement for the use of a firearm.

¶ 3    On appeal, the defendant argues: (1) his conviction must be reversed because the predicate felonies were inherent in the murder and were not committed with an independent felonious purpose, (2) he received ineffective assistance of trial counsel where his counsel failed to call certain witnesses who would have corroborated his claim of self-defense and failed to offer a jury instruction on the defense of others or on justified use of force, (3) his constitutional rights were violated where his counsel was denied the opportunity to cross-examine the State's witness about the witness's expectation of leniency concerning a pending criminal case, (4) the admission of certain evidence was irrelevant and overly prejudicial, (5) the trial court erred in refusing to allow his counsel to ask certain questions about transferred intent to the potential jury members during *voir dire*, and (6) his 60-year sentence was excessive. For the following reasons, we affirm.

¶ 4                                I. BACKGROUND

¶ 5     On March 26, 2016, the defendant, who was a student at Southeast Missouri State University (SEMO), traveled with his cousin, Anthony Griffin, and his cousin's friend, Calvin White, from Cape Girardeau, Missouri, to Carbondale, Illinois. They planned to attend a "probate party" for the Phi Beta Sigma fraternity at Hangar 9 (a nightclub in Carbondale). At around 2 a.m., they left the club and went to an after party at a house located at 402 West Walnut, which was known as the "Sigma House." While there, a physical fight broke out inside the living room, and gunshots were fired inside the overcrowded house. Thereafter, there were gunshots fired outside the house, which left Nehemiah Greenlee injured and Timothy Beaty, a neighbor, deceased (Beaty was inside his apartment at the time). The defendant and his codefendant, John Ingram,[1] were subsequently arrested for the shootings.

¶ 6     On June 17, 2016, the defendant and Ingram were charged by indictment with: (1) one count of first degree murder based on felony murder in that while attempting to commit or committing aggravated battery with a firearm, they shot at Greenlee but caused Beaty's death; (2) one count of first degree murder based on felony murder in that while attempting to commit or committing aggravated discharge of a firearm, they discharged a firearm at or into a building that they knew or reasonably should have known was occupied, which caused Beaty's death; (3) one count of aggravated battery with a firearm in that they knowingly and without legal justification caused injury to Greenlee by discharging a firearm; (4) one count of aggravated discharge of a firearm in that they knowingly discharged a firearm at or into a building at a time when they knew or reasonably should have known that it was occupied; and (5) one count of aggravated discharge of a firearm for knowingly discharging a firearm in Greenlee's direction.

_____

[1]Ingram is not a party to this appeal.

3

¶ 7    In March 2018, the trial court held a seven-day jury trial.[2]  At trial, Jarin Dunnigan, a police officer for the Carbondale Police Department, testified that he was dispatched to the Sigma house after multiple reports of shots fired.  Upon arriving, he entered the residence and saw Greenlee lying on the floor with a gunshot wound in his right front abdomen.  Greenlee was able to describe the shooter as a light complexion black male wearing a brown scarf and a hat.

¶ 8    Illinois State Police (ISP) trooper Blake Harsy, who was previously a police officer with the Carbondale Police Department, testified that he was also dispatched to the Sigma house. While in the house, he observed a chrome handgun magazine that was loaded on the floor near a brick fireplace and a live .40-caliber cartridge on the fireplace ledge.

¶ 9    Lee Stewart, a Carbondale Police Department patrol detective, testified that he was dispatched to the Sigma house for the shooting.  At that time, he was a crime scene technician. When he arrived, he observed "utter chaos"; he noted that people were running in every direction, were screaming, and several people were piling out of the Sigma house.  As he approached the house, he observed people fighting up the street toward the 300 block of West Walnut.  He reported the fight over the radio and proceeded to the Sigma house because officers were inside attempting life-sustaining measures on an individual who had been shot, and the residence needed to be secured.  He entered the front door and observed an individual with a gunshot wound lying on the floor.  He estimated between 50 to 100 people still inside; it was a large amount of people packed into a fairly small house.  He helped the other officers move people out of the house, and it took several minutes before the house was secured.  After the house was secure, he went to other locations in the area to search for evidence and to preserve the crime scene.  In his search, he found eight spent .40-caliber Smith & Wesson R-P shell

_____

[2]At some point, the defendant's case was severed from Ingram's.

4

casings, seven 9-millimeter Corbon Ruger shell casings, and one live .40-caliber shell casing on the road at the intersection of West Walnut Street and South Beveridge.

¶ 10    After discovering the shell casings, Stewart expanded the search area and started searching the yards between 402 and 334 West Walnut, where he found a black and silver Smith & Wesson .40-caliber magazine loaded with 14 rounds. A spent .40-caliber Winchester shell casing was found in front of 322 West Walnut (east of the Sigma house, on the north side of the road), which was different from the ones previously found. He acknowledged that before the officers were able to secure the area, people were running and driving through there, and consequently, some of the shell casings could have been kicked, walked on, or driven over.

¶ 11    Brody Jeters, a patrol officer with the Carbondale Police Department, testified that when he arrived at the Sigma house, he noticed multiple people, both civilians and officers, running toward the 300 block of that street. He followed the officers as they were chasing someone, and he wanted to assist them. He eventually ended up at the parking lot of a funeral home and a Presbyterian Church at around the 300 block of West Walnut. He noticed that there were 10 people standing next to a red Dodge Avenger and a silver Dodge Avenger (registered to William Donegan), both with Missouri plates. The officers obtained permission to search the vehicles and discovered a Smith & Wesson silver over black .40-caliber firearm with no magazine in the silver Avenger.

¶ 12    Jeffrey Withrow, an officer with the Carbondale Police Department, testified that he assisted the other officers with canvassing the area to locate any witnesses or evidence. As he approached 334 West Walnut, he noticed a bullet strike on the south side of an apartment. He attempted to make contact with the residents by knocking on the door. He did not receive a response, so he looked through the window at the top of the door and noticed a man lying on the

5

floor on the other side. He knocked again to see if the man would respond to the noise, but the man did not, so he opened the unlocked door and entered the residence. Withrow noticed that the man was pale, his eyes and mouth were both open, and he did not appear to be breathing. Withrow checked for a pulse and realized that the man was already deceased. The man was identified as Beaty.

¶ 13 Seth Moorman, another officer with the Carbondale Police Department, testified that he initially went to the First Presbyterian Church, which was approximately one block away from the Sigma house. He parked in the parking lot and approached the area on foot. While walking, he observed people running in all directions. As he got closer, there were people pointing further to the west and saying, "It happened over there. It happened over there." They were pointing toward the Sigma house. He approached the house and was instructed by Withrow to remain in the front yard to monitor the crowd of people still in the area. While there, he observed a group of people fighting to the east in the 300 block of West Walnut. As he ran to that location, he noticed individuals running toward the parking lot where he had parked and heard multiple people saying, "That's the shooter. That's the shooter." Those people were all pointing to a black male, who was identified as Donegan.

¶ 14 Jesse Ital, an officer with the Carbondale Police Department, testified that on March 30, he went to St. Francis Xavier Church and the administrative office to search for evidence. He was instructed to search the area for ballistic or ammunition evidence based on information that was obtained from a witness. The church was within the 400 block of West Walnut. He observed a discoloration in the grout between two of the bricks on the outside of the administrative building approximately five feet up, and he believed it to be a bullet strike. He also found a fired shell casing on the sidewalk in front of the administrative building,

approximately eight feet back from the wall. He noted that there was no way to tell where the bullet came from but acknowledged that it could have come from 334 or 402 West Walnut.

¶ 15    James Minckler, an ISP crime scene investigator, testified that he processed the crime scene at 334 West Walnut. He observed the body identified as Beaty lying on the floor inside the apartment. Beaty had a gunshot wound at his rib cage on the right side; there was no exit wound. He began searching the apartment for the origin of the bullet and discovered a hole in the corner of the wall in the main room, which appeared to be coming from the outside. He also observed a corresponding hole in the exterior of the siding on the south wall of the apartment. Using a trajectory rod with an attached laser, he determined that the bullet originated from across the street to the area of South Beveridge Street, which was just south of West Walnut.

¶ 16    Megan Robinson testified that she attended the party at the Sigma house with her friends, Desiree White and Dominique White. At the time, she was a Carbondale resident. When she arrived, she observed that the house was crowded. She was in the kitchen when she heard gunshots inside the house, but she did not see anyone shooting. After hearing the gunshots, she ran out of the house through the back kitchen door. She noted that it was chaos and other people were running out of the house and pushing into each other. She ran to a grassy area to the left of the house. Beaty, who had come outside to see what was going on, pulled her and Desiree onto the porch of his apartment next door. Then, there was a second series of gunshots, and Beaty pulled them inside the apartment. She did not see the person shooting, and she did not know how many shots were fired. After the shots had stopped, they realized that Dominique was no longer with them. They also noticed that Beaty was lying on the floor in the fetal position. He appeared to be asleep, not harmed in any way, and there was no blood around him. She tried to

talk to him, but he did not respond; he was not making any sound. She eventually called 9-1-1 because he remained unresponsive.

¶ 17 Dominique White testified that she was moving from the Sigma house kitchen to the main room when she heard approximately four to six gunshots from inside the front of the house. At that point, she attempted to run toward the back exit to get away from the shooter, but everyone was pushing toward that same exit, and she started getting pushed toward the front of the house. She and her friend got stuck in the corner of the kitchen for about five minutes. Once the house cleared, she attempted to get her friend, who was pretty shaken up, to leave through the front door with her, but people started coming back inside the house from the backyard. At that point, she and her friend got up and went with the crowd through the front door. They had only been outside for a few seconds when they heard more gunshots; she heard approximately four or five gunshots that time. She instinctively looked in the direction of the shooting and saw someone shooting, but she did not see a face or any details. She did see that the shooter was wearing black clothing, and someone had their hands up in a shooting motion across the street from the Sigma house. She then ran toward the back of the Sigma house.

¶ 18 Desiree White testified that she was only at the Sigma house for approximately 30 minutes before she was pushed back outside through the back door. She explained that it looked like there was a fight in the living room that was spilling over into the kitchen, and there was a wave of people pushing each other trying to get out of the living room. Once outside, she heard people screaming and a gunshot from inside the house. She was on Beaty's porch when she heard more gunshots and observed people still running out of the Sigma house. She heard at least 20 more gunshots, Beaty pushed her and Robinson into his apartment, and they all stayed on the ground. After the gunshots were over, she noticed that Beaty was not responding with

8

words; he was just moaning. However, she did not see any injuries on him. She ultimately left the house after Robinson called 9-1-1. She did not see who fired the shots or where they were coming from, but she could hear that they were near.

¶ 19 Joshua Bell, who was a student at Southern Illinois University-Carbondale (SIU) in March 2016, testified that he attended a fraternity event on campus. After the event, at around 10 or 10:30 p.m., he went to Hangar 9 with his friends, including Greenlee. He was there until approximately 1:45 a.m., and then he went to the Sigma house for the after party. There were over 100 people at the party, including Greenlee, Anthony Jones, and several people that he recognized from Hangar 9. He was in the living room when an altercation broke out; he could not hear what was being said, but the people involved were having words with each other. He could not see what was happening because it was dark in there, and there were several people between him and the altercation. The people involved were at Hangar 9; he also knew them from seeing them around. He recognized the individual wearing a red jumpsuit as Wale (the man was later identified as Daniel Holmes). He observed Wale fire two gunshots at the floor inside the house.

¶ 20 After the gunshots, everyone in the house was trying to exit, and Bell ran out the back door. While outside, he was running toward the front of the house when he heard more shooting coming from across the street. He saw two individuals shooting and identified one of them as the defendant; he noted that the defendant was wearing a scarf, a hat, and light blue pants. The defendant was shooting toward the Sigma house from across the street; he shot approximately five times. Bell could not see the other shooter, but he could tell where the shooting was coming from. The shooting then stopped, and he observed that Greenlee had been shot and was lying on the ground. Bell then saw a man wearing a Cardinals jersey run into the street toward the church

9

(north on West Walnut). Bell knew the man was with the shooters, so he chased after the man. Bell caught up with the man and began to beat him up. Bell explained that his adrenaline was high, he had just seen his friend on the ground after being shot, and he did not know if his friend was dying. He did not see Greenlee with a gun that night. Later that morning, Bell went to the police station and made a written statement. He acknowledged that he did not identify Wale as the person shooting the gun inside the house in his statement but explained that he did not know Wale at the time; he did not learn of Wale's nickname until after the shooting.

¶ 21 Jones testified that he was working security at Hangar 9 when he observed a couple of individuals in St. Louis attire getting into a verbal altercation with a man that went to SIU; he knew the person from SIU as Dre. He did not know what they were fighting about, but he went to separate them. There were approximately six people involved. The altercation broke up when he separated them and that was the end of it. He left there around 2 a.m. and went to the Sigma house for the after party. Greenlee, Dre, and Bell were all there. He entered the house through the back entrance and went into the living room with Dre. As soon as Dre walked into the living room, the atmosphere changed. An individual wearing a St. Louis Blues shirt that was involved in the Hangar 9 altercation came up and punched Dre; he was with approximately five people. Jones then saw Wale with a gun shooting at the floor. He also saw another individual known as Trigger shooting at the ground; Trigger was wearing all black. Everyone then scattered and started running out of the house. Wale and Trigger both ran out the front door, and the man wearing the Blues shirt ran out of the house too.

¶ 22 As the house started to empty out, Jones shut the front door, so the remaining would exit through the back door. At this point, the living room was empty, but the kitchen was still full of people. Jones was standing by the front door with Greenlee when two individuals approached

10

Jones and Greenlee and told them to open the door. One was wearing a Cardinals hoodie, and the other, who Jones identified as the defendant, was wearing a scarf, a black hat, and a white, long sleeve shirt. He told them to go through the back door but eventually opened the front door for them. The man in the Cardinals hoodie turned around and ran out of the back door, but the defendant exited out the front door. While exiting, the defendant pushed into Jones's left shoulder. Although Jones shrugged it off, Greenlee confronted the defendant, told him that there was no need for pushing, and then pushed him. The defendant and Greenlee then got into a verbal argument on the porch and were saying that they were going to fight. Jones got between them, and the defendant pulled toward his waist and displayed the handle of a gun. The defendant said that he was going to kill Jones and Greenlee, and Jones told him to put the gun down and fight. In the scuffle, Jones and Greenlee ended up in the yard between the Sigma house and the neighboring house. The defendant ran away down South Beveridge.

¶ 23    About five seconds later, the defendant came back with another individual, and Jones heard shots. The defendant was in the street when this occurred. At first, the shots were fired toward the street but then Jones noticed that the subsequent shots were angled toward him and Greenlee and some of them were in the air. The shots were coming from the defendant's gun. The individual with the defendant was also shooting; he did not get a good look at the person because he was solely focused on the defendant. He froze for about five seconds and then felt Greenlee push him. He turned around and saw Greenlee lying on the ground. Greenlee then got up and went back inside the Sigma house. The defendant and his friend ran off. He believed that there was a total of 13 or 14 shots from both individuals. Jones went inside the Sigma house and found Greenlee lying on the floor bleeding near his stomach. There were two women with Greenlee; one was putting pressure on the wound and the other was calling 9-1-1.

11

¶ 24    Jones then started hyperventilating, so he went back outside.  At that point, he saw the individual wearing a red Cardinals shirt running from behind the house and across the street.  He knew this person was part of the group that was shooting, so he and Bell started chasing the individual toward the church on South Beveridge.  They eventually caught up with him, and there was a physical altercation between the man and Bell.  The fight lasted approximately 10 seconds, at which point the individual got up and started running again in the same direction.  Jones identified the defendant as one of the shooters from video surveillance footage at Hangar 9.

¶ 25    Jones testified that Greenlee did not have a gun that night and did not shoot at anyone.  He acknowledged that in his March 27 statement, he wrote that during the party, he had to kick out a group of people who were fighting inside the house, and they went around the side of the house and started shooting.  Then, they reentered through the back.  However, he denied writing that the individuals started shooting at the side of the residence and instead claimed that he had to kick them out, people then started running out of the house, and he heard gunshots.  This occurred after the gunshots fired inside the house, and the defendant was still inside at this time.  He acknowledged that the defendant's threat to kill them was not included in his police statement.  He did not remember saying that the person shooting outside was standing in the church parking lot.

¶ 26    Greenlee testified that he went to Hangar 9 with his friends, including Bell.  He noted that there was almost a brawl inside the bar, but it was broken up before it could turn physical.  The defendant and his friends were involved in the altercation with a man named Mario; the defendant's friends were wearing St. Louis sports attire.  Greenlee did not know what the argument was about, but he noted that it was escalating when Jones broke it up.  After that,

12

everything returned to normal. He left there about one hour later and went to the Sigma house; he arrived there between 1 and 2 a.m. At some point, the atmosphere in the house changed, and a fight broke out in the living room. He noted that the individuals involved in the Hangar 9 altercation were the same people fighting in the house. He saw Wale pull out a gun, and he tried to stop Wale from shooting it. However, the defendant's friends ran up to Wale, and Wale shot the gun twice into the floor. Then, everyone started running toward the exits of the house, and Wale ran out the front door.

¶ 27    After the shooting inside, Greenlee and Jones went to the front door and locked it because they did not want anyone coming back in through that door. The defendant and his friend approached, so Jones opened the door to let them out. However, the friend ran out of the living room toward the back door. The defendant exited through the front door, and as he was exiting, he shoved Jones. Greenlee reacted and told the defendant that he did not have to shove. They then got into a verbal argument, and the defendant acted like he was pulling out a gun. Greenlee did not see a gun, so Greenlee thought that the defendant was just acting like he had one. The altercation moved to the front porch, and they all ended up in the front yard. The defendant eventually ran off across the street onto Beveridge Street, and Greenlee and Jones decided to leave.

¶ 28    Greenlee saw the defendant run approximately 15 to 20 feet to either a black or red Charger and open the vehicle's trunk. He then saw people running down Beveridge Street, and he heard gunshots; the defendant was shooting in his direction. As soon as he saw the defendant shooting, he pushed Jones to the ground. He saw the defendant shoot approximately four shots at him, and one of the shots hit him in his stomach on his side. He believed that the defendant was aiming at him because the defendant was looking at him while shooting. There was another

13

shooter with the defendant. Greenlee did not see that shooter's face, but the man was wearing dark clothing and was shooting into the air. He was never able to identify the second shooter. Greenlee acknowledged that the defendant was standing on West Walnut and not in the church parking lot. After getting shot, Greenlee ran toward the house, fell on the porch, and crawled into the living room. He did not have a gun on him that night, and he did not shoot a gun at anyone. He acknowledged that when the investigating officer asked him to identify the shooter from a series of photographs, he stated, "maybe, it's number four," which was the defendant. He acknowledged that his identification was not as precise as his testimony, but he was in the hospital at the time that he was questioned, and he had no doubt that the defendant was the person who shot him.

¶ 29    Thomas Gamboe, an ISP forensic scientist, testified that the projectile recovered from Beaty was a .40-caliber bullet fired from the same gun that fired the two other bullets found around 334 West Walnut. Eric Corey, an ISP forensic scientist, testified that a partial DNA profile was obtained from the magazine discovered on the grass between the Sigma house and 334 West Walnut, but it did not match the DNA profiles of the defendant, Dwayne Dunn, or Ingram. However, he could not say that any of those individuals did not touch the magazine as some people do not leave DNA when they touch an item.

¶ 30    James Jacobi, a forensic pathologist, testified that he performed Beaty's autopsy and noted a gunshot entrance wound in the right side of Beaty's chest. He recovered the projectile from Beaty's left upper chest; he noted that the bullet struck the lower part of his right chest and traveled across his body, right to left and sightly upward. The bullet struck his liver, heart, and left lung before it came to rest in the soft tissues of his left upper chest. Jacobi noted that there

14

would be very little external bleeding from this type of wound. He opined that the cause of death was due to a gunshot wound striking three organs and resulting in an extensive loss of blood.

¶ 31    Anthony Williams, a sergeant with the Carbondale Police Department, testified that he interviewed Dunn. During the interview, Dunn voluntarily gave Williams access to his cell phone; Williams believed Dunn's phone might contain clues as to who was responsible for the shooting. While looking at Williams's Snapchat, he saw a video compilation of photographs of the defendant. Williams used his own cell phone to record the Snapchat video. The video was played for the jury. One of the frames showed the defendant with the caption, "I'm fucked," and another depicted the defendant showing his left hand which appeared swollen. The video ended with a series of captions that said, "what comes around goes around"; "Carbondale won't be seeing wink"; "last night was hectic"; "free my guys, tho"; and "when it comes around, it is only going to be you." Williams also had Dunn send messages to his associates who were from SEMO and were at the party that night. The defendant responded to Dunn's message indicating that he was going to get high for Dunn. Williams acknowledged that Dunn initially lied to him and lied to other officers before giving Williams access to the phone.

¶ 32    Williams also interviewed Greenlee after Greenlee was released from the hospital. During that interview, Greenlee identified Holmes as the person who fired the gun inside the house. Greenlee also identified the defendant as the person who shot him from the Hangar 9 video surveillance; the defendant was wearing a camouflage hat with a blue scarf over his head and a white shirt. Williams did not believe that he asked Greenlee about the bullet strike on the administrative building of the church; Greenlee never told him that there was gunfire going that direction. He acknowledged that he never confronted any of the witnesses about that bullet strike and whether there was gunfire going in that direction, although he did ask them about all

15

of the shooting they observed that night. However, he explained that the fact that there was a bullet strike on the administrative building did not necessarily conflict with the information that he obtained from Greenlee, Jones, and Bell. He explained that he was not surprised that none of them saw the bullet strike the church since there was a lot going on that night.

¶ 33   Brandon Weisenberger, a detective with the Carbondale Police Department, testified that he searched the defendant's dormitory room at SEMO pursuant to a search warrant. During the search, the investigators found a camouflage hat with the words "True Religion" on the front, a dark colored scarf with a Ralph Lauren logo, a white shirt, and acid wash jeans; all items of clothing that the defendant was wearing on the night of the shooting. Weisenberger also discovered that the defendant had purchased a Glock 23, .40-caliber semi-automatic pistol on February 12, 2016. There were no known documented transfers of the pistol. He acknowledged that neither Bell, Jones, nor Greenlee told him that gunfire was going south, and he did not believe that anyone from his office talked with them about the evidence obtained from the administrative building. He also acknowledged that the bullet from the administrative building was the first evidence collected that showed the gunfire going south. He explained that the evidence indicated that there was a spray of gunfire going in multiple directions. None of the witnesses indicated that Greenlee had a firearm that night or even fired a gun that night.

¶ 34   Ellen Chapman, an analyst for the ISP Forensic Science Center, testified that she tested the clothing taken from the defendant's dormitory room for gunshot residue to see if the items were in contact or in the environment of a discharged firearm. The samples taken from the scarf and the white shirt tested positive for gunshot residue.

¶ 35   Ingram testified that he made an agreement with the State to testify in this case in exchange for immunity; he was initially charged with murder but ultimately pled guilty to

16

aggravated discharge of a firearm and was sentenced to nine years' imprisonment. At the time of the shooting, he was a student at SEMO and went to Carbondale for the fraternity party. He drove his vehicle to Carbondale, and his Rogue 9-millimeter firearm was in the trunk. At some point, he left the Sigma house to retrieve his gun because some friends were borrowing his car. He then reentered the house with his gun in a holster on his hip. He was in the living room when he saw "Will" punch a man in the face and drag him to the floor. The other people with "Will," including the defendant, started kicking the man. Ingram then heard shots fired inside the house, and he ran into a bedroom. When things were clear, he exited the house through the open front door and ran across the street. While exiting, he noticed four men standing in front of the door, one of which had a revolver.

¶ 36     As Ingram was crossing the street, he heard one or two gunshots coming from "ahead of him" in the middle of the street; he explained that he was heading south, but he kept turning back around to see what was happening behind him. The shots were being fired in the direction of the Sigma house. He crossed the street, turned back around toward the Sigma house (to the north), and fired his gun, as he felt there was a threat behind him. He did not see anyone pointing a gun at him, and he did not remember whether anyone fired in his direction (south). He initially started shooting in the direction of the people near the house, but then started shooting into the air because of the gun's recoil. The other person was also still shooting at this time; that person was on his side, approximately two to three feet away. He then turned around and started running toward a friend's vehicle. As he turned around, he saw the defendant running down the street away from the house; he noticed the defendant also had a gun. He did not remember telling his friends that he acted in self-defense or that "they" shot first.

17

¶ 37    Angela Horn, an ISP forensic scientist, testified that the projectile found near the administrative building was a .38-caliber bullet, but she did not know whether it was fired from a 9-millimeter or a .38-caliber revolver.  Christopher Robinson, a private forensic consultant, testified that he examined the bullet discovered near the church and that it was a .38-caliber Remington bullet consistent with being fired from one of three different types of revolvers: Smith & Wesson, Ruger and Taurus .38-Special, and .357-Magnum.  He denied that the bullet was fired from a 9-millimeter.

¶ 38    The defendant acknowledged that he posted a photograph on Snapchat of his wrist, explaining that it was injured when someone stepped on it at the Sigma house party.  He also acknowledged that he posted "what goes around comes around" and "when it comes around, it is only going to be you," explaining that they were lyrics to a song that he was listening to at the time.  He posted that Carbondale "won't be seeing wink" because that night was horrible as he almost lost his life.  He posted "man, shit was hectic last night" because the night was chaos.  He explained that he was dealing with emotions from the night before and was posting his emotional thoughts.

¶ 39    The defendant testified that he traveled to Carbondale with Griffin and Calvin to attend a fraternity party; Griffin drove his red Charger.  They were drinking in the dorms before leaving.  They initially went to Hangar 9, and there were at least 15 other SEMO students there.  While there, an altercation broke out in the front by the stage; he recognized one of the individuals involved in the altercation as Donegan, another SEMO student.  He did not recognize anyone else involved.  He decided to intervene because although it was just a verbal altercation, it looked like it was escalating into a physical fight.  He got in between the individuals and told them that they were there to have fun, not fight.  Both individuals listened to him, and the fight broke up.

¶ 40    After leaving there, they went to the Sigma house after party and parked on South Beveridge. There were less than 15 people inside the front room when they arrived, but the house quickly became crowded. He did not consume any alcohol while there. He noticed Ingram enter the house, then leave, and did not see Ingram again until later that night. A fight broke out in the living room, and both Dunn and Donegan were involved. He did not travel to Carbondale with them and did not go to the after party with them. He did not recognize the other group that was involved in the fight. The fight was escalating, and the crowd of people started pushing and falling over each other; he noted that it was chaos. He tripped over the fireplace that he was standing by, fell on the ground, and his wrist got stepped on. He then heard two or three gunshots fired inside the house, but he did not see who fired the gun. He crawled into a nearby bedroom for safety.

¶ 41    About 30 seconds later, after the living room emptied out, the defendant decided to exit the house through the front door. The door was open at the time. As he neared the door, two individuals approached him and told him that he could not exit through that door. At the time, he did not know who they were; he later learned they were Greenlee and Jones. He responded, "move the fuck out of my way" and "I have got to get the hell up out of this house." At that point, he still feared for his safety. Greenlee and Jones were standing in the doorway, but he saw an opening, and he squeezed through. As he was doing this, his left shoulder bumped into Jones. Greenlee then pushed him from behind, and he stumbled down the porch into the grass. Greenlee, who was still on the porch, then said, "you ain't got to push him like that," and raised his shirt up. When Greenlee raised his shirt up, the defendant saw a revolver in his waistband.

¶ 42    The defendant then began backing up toward West Walnut with his hands raised, and when he made it to South Beveridge, Greenlee pulled out his gun and said, "Talk that shit now.

19

Talk that shit now." Greenlee then shot two times in his direction, and the defendant felt the bullets go by his face. At that time, Greenlee was standing in the grass in front of Beaty's residence. The defendant had his own firearm in a holster on his hip, so he grabbed it and shot back. He shot until his magazine was empty and then he ran to the vehicle. He explained that he was in fear for his life at that time; he believed that Greenlee was going to kill him. He also heard someone shooting a firearm far behind him on South Beveridge. He denied telling Greenlee and Jones that he would kill them, and he denied going to the Charger to retrieve his firearm.

¶ 43 While running toward his vehicle, the defendant also saw Ingram running toward Ingram's own vehicle. The defendant reached the vehicle and told Griffin and Calvin to get inside because they had to leave. They headed back to SEMO but stopped at White Castle before going back to campus. The next day, he went to a friend's house, and they were smoking marijuana.

¶ 44 On cross-examination, the defendant testified that although he was going to Carbondale to have fun and not fight, he took his gun with him because he did not want any trouble. His gun was fully loaded. He acknowledged that as they were leaving the area, two police cars passed by, but he did not stop to talk to them because he wanted to get to safety. He did not call 9-1-1 to report that he had been shot at or go to the local police station; he explained that he was still not safe because he was in an unfamiliar town. However, he did not report the shooting to the Cape Girardeau Police Department either.

¶ 45 The defendant then rested his case, and the State had no rebuttal. After hearing closing arguments from counsel, the jury found the defendant guilty of two counts of first degree murder, one count of aggravated battery with a firearm, and two counts of aggravated discharge

of a firearm. The jury also found that the defendant, during the commission of the first degree murder, personally discharged a firearm that caused great bodily harm to another.

¶ 46    On April 26, 2018, the defendant filed a motion for judgment on acquittal or, in the alternative, a new trial, in which he contended, *inter alia*, that the trial court erred in not allowing him to question the potential juror members during *voir dire* about whether they could be fair and impartial where self-defense was raised; the court erred in denying his motion *in limine* with regard to the photograph captioned "Gang," the photograph of him purportedly chugging vodka, and his message that he was getting high; the court erred in granting the State's oral motion *in limine*, which precluded defense counsel from questioning Bell about his expectation of leniency in his pending criminal case in exchange for his favorable testimony in this case; and he could not be convicted of felony murder based on the underlying felonies of aggravated discharge of a firearm and aggravated battery with a firearm because those felonies were inherent in the murder.

¶ 47    Thereafter, new counsel was appointed for the defendant, and on June 18, 2018, the defendant filed a supplement to his motion, which provided additional support for the previously made arguments. He also argued that his counsel was ineffective for not objecting to the felony murder charges based on the predicate offenses being inherent in the murder, for not requesting jury instructions on second degree murder and/or involuntary manslaughter, for not requesting a jury instruction on the defense of others, and for failing to call multiple witnesses that would have corroborated his defense.

¶ 48    On June 27, 2018, the trial court heard arguments on the defendant's posttrial motions and then commenced with the sentencing hearing. As to the posttrial motions, the defendant's

posttrial counsel presented testimony from two witnesses,[3] arguing that trial counsel was ineffective for failing to call them at trial as they would have corroborated the defendant's use of force defense. Griffin testified that he was with the defendant at the Sigma house party. When he heard the gunshots inside the house, he ran out the front door to his vehicle. He waited for the defendant there and observed two men, one standing on the right side of the house, and the other standing on the front lawn, shooting guns toward Walnut Street in the direction of the church parking lot. He heard approximately 4 to 10 gunshots. He observed bullets ricocheting, and he was scared for his life. He spoke to the defendant's counsel one time about what he observed approximately one to two months after the incident, but he was not called as a witness to testify at the trial. He did not recall talking to law enforcement about the incident.

¶ 49     Lena McMiller testified that she was standing in the church parking lot directly across the street from the Sigma house with her friends when she heard two or three gunshots inside the house. She then observed several people running out of the house and heard gunshots outside. As she was running to her vehicle, a bullet flew past her and hit the church. She then changed directions and continued running to her vehicle. She believed that several gunshots were being fired in her direction; she heard approximately 10 to 15 gunshots. She did not see anyone holding a gun that night. She talked to the defendant's counsel approximately one month after the incident and then right before the trial and told him exactly what she testified to. The court then heard counsels' arguments and subsequently denied the defendant's posttrial motions, finding that the defendant's ineffective assistance of counsel claims involved matters of trial strategy.

---

[3]The defendant's posttrial counsel intended to present testimony from three witnesses, but only two of them showed up at the hearing.

¶ 50    The trial court then proceeded to the sentencing hearing, during which it indicated that it had received and reviewed the presentence investigative report (PSI), two victim impact statements, and four letters submitted on the defendant's behalf. The State presented testimony from Kittie McMillan, Beaty's mother, who read her victim impact statement. She then testified that Beaty's death had impacted her entire family and that Beaty had a son, who would grow up without a father. Don Beaty, Beaty's father, testified that Beaty's untimely death was an ever-present emotional burden that impacted him physically and financially. He was self-employed and had lost income because he was unable to function to his full potential due to emotional stress and lack of sleep. He noted that his grandson lost a loving father who was involved in his life. Jennifer Kiper, Beaty's sister, testified that Beaty was a good father and her sons' favorite uncle. Jessica Beaty, Beaty's wife, testified that she was married to Beaty for 5 years, but they had been together for a total of 12. Beaty was the best father to their son, who was autistic; she stated that Beaty read to him every night, picked him up from school every day, took him to the park, and played superheroes with him. Since Beaty was killed, their son had become obsessed with death and talked about it constantly. Because he was autistic, he could not engage in typical counseling, but he had a therapist who was trying to work through it with him.

¶ 51    In aggravation, the State contended that it was important to deter others from committing the same crime as this was another example of gun violence in the community. The State noted that the purpose of felony murder was to deter individuals from committing a forcible felony by holding them responsible for any resulting murders. The State also noted that the defendant discharged his weapon multiple times directly in the middle of Route 13, which was the main thoroughfare through Carbondale and near St. Francis Xavier Church, on Easter Sunday. The State argued that it was the defendant's actions that killed Beaty, who was an innocent victim

23

trying to keep others safe. The State acknowledged that according to the PSI, the defendant was not a bad kid, he was going to college, and, although he was raised without a father, he had the support of his mother, who raised him and his siblings by herself. However, the State argued that the evidence showed that the defendant bragged about doing drugs after the shooting, about getting into a fight, and about what he had done in Carbondale that night.

¶ 52    Although the defendant claimed his acts were justified, and the statements offered on his behalf characterized his actions as a mistake, the State disagreed and argued that they were conscious actions. In support, the State noted that the defendant traveled from Missouri to Illinois with his loaded gun, took that loaded gun to a party, and then decided to stop on Beveridge Street and repeatedly shoot at Greenlee. Thus, the State recommended a sentence of 45 years' imprisonment for the first degree murder conviction. The State noted that since the jury found it applicable, the court must sentence the defendant to an enhancement of 25 years to natural life and recommended 30 years for the enhancement. The State also recommended that the defendant be sentenced to 20 years' imprisonment for the aggravated battery with a firearm conviction and 5 years each for the aggravated discharge of a firearm convictions. The State noted that the sentences must be consecutive to each other.

¶ 53    In mitigation, the defendant's counsel contended that the defendant was a young man with no criminal history, took honor classes in high school, graduated in the top 30% of his class, and played college football at Lane University before transferring to SEMO. He was studying business management in college because he aspired to own his own business, and he hoped to play college football again. He had four siblings, who he deeply cared for, and he was their father figure because their father was not in their lives. Defense counsel argued that the defendant did not wake up that morning with the plan to commit murder, and although the jury

24

rejected it, there was evidence that he acted in self-defense. Counsel also argued that there was evidence of provocation in that Greenlee flashed his firearm at him, pushed him from behind, and fired the first shot at him. Counsel argued that the defendant deserved leniency because he did not intend to kill anyone until he was shot at, and he simply intended to defend himself.

¶ 54 Defense counsel further contended that the lesser included offenses merged into the felony murder, and those convictions must be vacated. Counsel argued that imposing a 25-year sentence enhancement would constitute cruel and unusual punishment and would be disproportionate to the underlying offense of an unintentional killing. Counsel argued that the defendant would not be given an opportunity to rehabilitate himself if given an effective life sentence, and that there was hope for rehabilitation in that he had never been involved in anything like this before and was a "good seed" prior to this incident. Therefore, counsel recommended a sentence of 20 years' imprisonment based on the lack of aggravating factors and the existence of the following mitigating factors: the defendant acted under a strong provocation, there were substantial grounds tending to excuse or justify his criminal conduct, he had no history of prior delinquency or criminal activity, he led a law-abiding life for a substantial period of time before committing the present crime, his criminal conduct was the result of circumstances unlikely to recur, and his character and attitude indicated that he was unlikely to commit another crime.

¶ 55 The defendant then gave his statement in allocution expressing his regret for his actions, asking for forgiveness, and pleading for a second chance. He indicated that he would use his second chance to help others going down the wrong path.

¶ 56 Thereafter, the trial court announced its sentencing decision. In making its decision, the court noted that it considered the PSI; the written victim impact statements; the victim impact

testimony from Beaty's family; the four letters that were submitted on the defendant's behalf; the trial testimony and exhibits; the way that the defendant conducted himself in court in that he always acted with respect; the information regarding his past, including his background and accomplishments in life in that he was a leader in school, made good grades, played sports, obtained a college scholarship to play football, was attending college at the time of the incident, and was attempting to better himself; his statement in allocution where he apologized for his actions; and counsels' arguments in aggravation and mitigation. The court also indicated that it considered the relevant factors in aggravation, specifically the need to deter others. As for factors in mitigation, the court noted that it considered whether the defendant contemplated that his criminal conduct would cause or threaten serious physical harm to another, whether he acted under strong provocation in this particular situation, whether there were substantial grounds tending to excuse or justify his criminal conduct, the fact that he had no criminal history, whether the criminal conduct was the result of circumstances unlikely to reoccur, his character and attitude that indicated that he was unlikely to commit another crime, and whether imprisonment would entail excessive hardship to his family since he helped care for his younger siblings.

¶ 57    Noting that there were multiple gunshots fired, the trial court found that the convictions were separate offenses, they were not lesser included offenses, and the defendant must serve mandatory consecutive sentences. With regard to the first degree murder conviction, the court sentenced him to 35 years' imprisonment plus a mandatory sentence enhancement of 25 years to be followed by a 3-year period of mandatory supervised release (MSR). For the aggravated battery with a firearm, a Class X felony, the court sentenced him to 15 years' imprisonment to be followed by 3 years of MSR. For the first conviction of aggravated discharge of a firearm, a Class 1 felony, the court sentenced him to five years' imprisonment to be followed by two years

26

of MSR. For the second aggravated discharge of a firearm conviction, the court sentenced him to another five years' imprisonment to be followed by two years of MSR.

¶ 58   On July 25, 2018, the defendant filed a motion to vacate his convictions and to reconsider his sentences, arguing, *inter alia*, that his convictions for aggravated discharge of a firearm and aggravated battery with a firearm should be vacated as lesser included offenses of felony murder. He argued that the 25-year sentencing enhancement was an impermissible double enhancement as it was based on the fact that he used a firearm, which was already used to enhance his crime to felony murder. He also argued that his sentence was excessive.

¶ 59   At the September 4, 2018, hearing on the defendant's postsentencing motion, the State conceded that the predicate felonies for felony murder were considered lesser included offenses that should be vacated. Thus, the remaining sentence was the 35-year sentence for first degree murder with the 25-year sentence enhancement to be served consecutively. After hearing counsels' arguments on the remaining allegations, the trial court denied his motion regarding those claims. The defendant appeals his conviction and sentence.

¶ 60                                   II. ANALYSIS

¶ 61                          A. Felony Murder Conviction

¶ 62   The defendant first contends his first degree murder conviction based on felony murder must be vacated because the predicate felonies of aggravated battery with a firearm and aggravated discharge of a firearm were inherent in the murder and were not committed with an independent felonious purpose.

¶ 63   An individual commits felony murder if, while attempting or committing a forcible felony other than second degree murder, a death occurs. 720 ILCS 5/9-1(a)(3) (West 2016). The purpose of the felony-murder statute is to deter individuals from committing forcible felonies by

subjecting an offender to a first degree murder charge if another person is killed during that felony. *People v. Pugh*, 261 Ill. App. 3d 75, 77 (1994). In proving a defendant guilty of felony murder, the State does not have to prove the intent to kill, which distinguishes it from other forms of first degree murder where the State must prove either an intentional killing or a knowing killing. *People v. Davison*, 236 Ill. 2d 232, 239 (2010).

¶ 64 Because of the nature of felony murder, our supreme court has expressed its concern that a felony murder charge may improperly allow the State to effectively eliminate the offense of second degree murder while avoiding the burden of proving an intentional or knowing first degree murder because certain predicate felonies tend to accompany all murders. *People v. Davis*, 213 Ill. 2d 459, 471 (2004). Thus, to address this concern, our supreme court has concluded that where the acts constituting forcible felonies arise from and are inherent in the act of the murder itself, those acts cannot serve as predicate felonies for a felony murder charge. *Davison*, 236 Ill. 2d at 240. "In other words, the predicate offense for felony murder must have an independent felonious purpose and not be merely incidental to the murder itself." *People v. Ruiz*, 342 Ill. App. 3d 750, 755 (2003). Therefore, the question is whether the forcible felony resulted in and caused the death, or whether it was the murder that gave rise to the forcible felony. *Id*. Where the murder gives rise to the forcible felony, the forcible felony cannot serve as a predicate felony for felony murder. *Id*. To answer this question, the court must review the factual context of the murder. *Id*.

¶ 65 The defendant cites *People v. Morgan*, 197 Ill. 2d 404 (2001); *People v. O'Neal*, 2016 IL App (1st) 132284; and *People v. Space*, 2018 IL App (1st) 150922, in support of his position that the aggravated battery with a firearm and the aggravated discharge of a firearm did not have a felonious purpose independent of the killing. In *Morgan*, defendant admitted that because he

28

feared for his life, he shot his grandfather, and then his grandmother as she attempted to flee. *Morgan*, 197 Ill. 2d at 412. On appeal to our supreme court, defendant argued that his felony murder conviction should be overturned because the predicate felonies, aggravated discharge of a firearm and aggravated battery, were not independent of the killings. *Id*. Our supreme court agreed, finding that aggravated battery and aggravated discharge of a firearm could not support a conviction for felony murder because, given the facts of the case, those offenses were inherent in the murders of defendant's grandparents. *Id*. at 447. In making this decision, the court noted that every shooting necessarily encompassed conduct constituting aggravated battery, *i.e.*, great bodily harm, as well as conduct constituting aggravated discharge of a firearm, *i.e.*, discharging a firearm in the direction of another. *Id*. Thus, potentially all fatal shootings could be charged as felony murder based upon aggravated battery and/or aggravated discharge of a firearm. *Id*. Therefore, the trial court erred in instructing the jury on felony murder. *Id*.

¶ 66 In *O'Neal*, defendant, who was a gang member, shot at a van that he thought was occupied by rival gang members. *O'Neal*, 2016 IL App (1st) 132284, ¶¶ 6-8. However, instead of hitting his intended target inside the van, defendant inadvertently shot and killed his friend who was sitting in a parked car on the opposite side of the street. *Id*. ¶¶ 6, 8. The State charged defendant with felony murder based on aggravated discharge of a firearm, intentional murder, and strong probability murder. *Id*. ¶ 2. The jury found defendant guilty of felony murder but reduced the intentional and strong probability murder counts to second degree murder based on the mitigating factor of unreasonable self-defense. *Id*. ¶ 3. The appellate court reversed the felony murder conviction and remanded for resentencing on the second degree murder conviction. *Id*. ¶ 4. In doing so, the court found that defendant's act of discharging a firearm in the direction of the van, the predicate felony charged in the felony-murder count, was inherent in

29

the murder itself. *Id.* ¶ 42. The court noted that this act was the only act committed by defendant—or anyone else—in that case. *Id.* The court noted that the State had conceded that every single shot defendant fired was aimed at, and intended for, the occupants of the van. *Id.* Also, the court noted that there were no events set in motion by defendant's shooting of the gun, such as return gunfire. *Id*. ¶ 45. Thus, the court found that defendant's discharge of a firearm in the direction of the van's occupants was an act inherent in the killing of his friend. *Id.* ¶ 54.

¶ 67    The *O'Neal* court also found that the State did not prove that defendant acted with a felonious purpose independent of the murder itself. *Id.* ¶ 57. Although the court acknowledged that this case was different from *Morgan* in that defendant missed his intended target and killed an innocent bystander, the court stated that it did not see how the felonious purpose in shooting a bullet could somehow change based on where that bullet happened to land, regardless of whether it landed with the intended target or the unintended bystander. *Id.* ¶ 58. The court observed that the law treated defendant's intent—his felonious purpose—in shooting the unintended victim as one and the same as his intent to kill the intended victim. *Id.* ¶ 59. If defendant intended to kill an individual, he was deemed to have intended to kill the innocent bystander. *Id*. Thus, the court held that defendant did not act with a felonious purpose that was independent of the act causing his friend's death. *Id*. ¶ 63.

¶ 68    In *Space*, defendant found his ex-girlfriend in the park with her new boyfriend, approached the boyfriend, and shot him at point blank range. *Space*, 2018 IL App (1st) 150922, ¶¶ 13, 18. A friend of the boyfriend went to his aid, and defendant also shot the friend, but he survived. *Id.* ¶ 22. The State charged defendant with felony murder based on aggravated battery with a firearm, and the jury found him guilty. *Id*. ¶¶ 4, 34. On appeal, it was clarified that the predicate felony was the aggravated battery of the friend that was the basis for felony murder.

30

*Id*. ¶ 42. The appellate court found that defendant did not have a distinct felonious purpose when shooting the friend, other than his motive and purpose to accomplish the murder of the boyfriend. *Id*. ¶ 48. The court noted that it was possible that defendant had fired the gun at the friend to prevent him from saving the life of the boyfriend. *Id*. However, it also noted that it was possible defendant intended to shoot the boyfriend again, but he instead hit the friend. *Id*. Regardless of his intention, the court found that both of those reasonable possibilities tended to show that defendant was acting with the same felonious purpose of accomplishing the murder of one victim when he committed the aggravated battery of the other. *Id*.

¶ 69    The *Space* court also found that the State could not establish proximate cause for felony murder where the boyfriend had been fatally wounded prior to his friend's intervention. *Id*. ¶ 52. Thus, because the aggravated battery with a firearm felony did not meet the causation requirement of felony murder, the court found that the aggravated battery with a firearm was not a valid predicate felony. *Id*.

¶ 70    Here, the State contends that this case is distinguishable from the cases cited by the defendant as Beaty was not the target of the defendant's bullets that night. Instead, the State argues that the defendant intended to shoot Greenlee and, in his act of shooting the bullets, shot Beaty, ultimately killing him. The State also noted that, unlike *O'Neal*, the jury did not convict the defendant of second degree murder and felony murder concerning the same predicate felony. Thus, the State contends that since the defendant ultimately killed Beaty as a result of his felonious aggravated battery with a firearm and his aggravated discharge of a firearm directed specifically at Greenlee, there existed an independent felonious purpose.

¶ 71    The State's position is supported by *People v. McGee*, where defendant was shooting at a member of a rival street gang when he missed and hit a baby in a stroller, killing the baby.

31

*People v. McGee*, 345 Ill. App. 3d 693, 695-96 (2003). The trial court found him guilty of felony murder predicated on aggravated discharge of a firearm. *Id.* at 696. On appeal, defendant argued that his aggravated discharge of a firearm was an act inherent in the murder of the baby and, thus, could not serve as the predicate offense. *Id*. at 697. The appellate court disagreed, finding that defendant shooting the rival gang member was conduct that formed the basis of the aggravated discharge of a firearm conviction, and his shooting of the baby was the conduct that formed the basis for the murder. *Id.* at 698. Thus, the court found that the predicate felony involved conduct with a felonious purpose other than the conduct that killed the baby. *Id.* In making this decision, the court noted that the facts were almost identical to the facts in *People v. Toney*, 337 Ill. App. 3d 122 (2003).

¶ 72    In *Toney*, defendant drove two of his fellow gang members into a rival gang's territory. *Id*. at 129. After one of the rival gang members threw a bottle at defendant's vehicle, defendant's friends got out of the car and opened fire. *Id*. at 127, 129. A gun battle between the two gangs then ensued. *Id*. at 129. The exchange of gunfire eventually resulted in the victim's death several minutes later at a different location. *Id*. at 137. Defendant was convicted of felony murder (among other offenses) on a theory of accountability because he had aided and abetted the other gang members by being their driver and by driving them into the rival gang's territory with the plan of mounting an armed assault. *Id.* at 128-29. On appeal, defendant argued that the aggravated discharge of a firearm could not serve as the predicate felony for felony murder. *Id*. at 128. The appellate court disagreed, finding the acts constituting the predicate felony did not arise from and were not inherent in the murder of the victim but, rather, involved conduct with an independent felonious purpose other than the killing. *Id.* at 137. That conduct involved the independent felonious purpose of discharging firearms at rival gang members, which triggered

an exchange of gunfire by the rival gangs eventually resulting in the victim's death several minutes later at a different location. *Id.*

¶ 73 According to the *McGee* court, the facts were similar to *Toney* in that defendant did not intend to kill the baby any more than defendant and his associates intended to kill the victim in *Toney*. *McGee*, 345 Ill. App. 3d at 698. Thus, the court reasoned that there was sufficient evidence that the acts constituting the predicate felony did not arise from and were not inherent in the murder of the baby but, rather, involved conduct with an independent felonious purpose other than the killing. *Id.* at 699. That conduct involved the independent felonious purpose of discharging a firearm at a rival gang member, which eventually resulted in the death of the baby. *Id.*

¶ 74 Here, the facts are similar to *McGee* where the defendant intended to shoot Greenlee, and in the act of shooting and injuring Greenlee, he shot Beaty, which ultimately resulted in Beaty's death. There was sufficient evidence that the acts constituting the predicate felonies here did not arise from and were not inherent in Beaty's murder but, rather, involved conduct with an independent felonious purpose other than killing Beaty. The defendant's shooting at Greenlee was the conduct that formed the basis of the aggravated discharge of a firearm and aggravated battery with a firearm, and his unintentional shooting of Beaty formed the basis for the murder. In reaching this conclusion, we find that *O'Neal* is distinguishable in that the *O'Neal* jury not only found defendant guilty of first degree murder based on felony murder, but also on the intentional and strong-probability murder counts, which reduced the conviction to second degree murder based on the mitigating factor of unreasonable self-defense. This case did not involve a jury finding of a mitigated mental state or a verdict of second degree murder. Thus, we conclude that, based on the particular facts of this case, the aggravated battery with a firearm conviction

33

and the aggravated discharge of a firearm conviction can serve as predicate felonies for felony murder.

¶ 75                              B. Ineffective Assistance of Counsel

¶ 76    In order to prevail on a claim of ineffective assistance of counsel, a defendant must establish that (1) counsel's performance fell below an objective standard of reasonableness and (2) defendant was prejudiced by counsel's substandard performance. *People v. Moore*, 279 Ill. App. 3d 152, 157 (1996). A defendant must prove both counsel's deficient performance and the resulting prejudice or the claim fails. *People v. Simms*, 192 Ill. 2d 348, 362 (2000). Under the deficiency prong, counsel is afforded wide latitude when making decisions concerning trial strategy. *People v. Reid*, 179 Ill. 2d 297, 310 (1997). Strategic decisions, such as which witnesses to call and what evidence to present on defendant's behalf, are trial counsel's to make. *Id.* Those decisions are generally immune from ineffective assistance of counsel claims, unless the chosen trial strategy is so unsound that counsel fails to conduct any meaningful adversarial testing. *Id.* Counsel's strategic decisions may be deemed ineffective when they result in counsel's failure to present exculpatory evidence of which he is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense. *People v. King*, 316 Ill. App. 3d 901, 913 (2000).

¶ 77                        1. *Counsel's Failure to Call Corroborating Witnesses*

¶ 78    The defendant contends that he received ineffective assistance of trial counsel when his counsel failed to call certain witnesses who would have corroborated his claim of self-defense. Specifically, the defendant argues his trial counsel was ineffective for failing to call Griffin, McMiller, and also "witnesses to whom *** Ingram made statements" that the other shooters fired in his direction first. He contends that there was circumstantial evidence of a threat from

34

the north side of Walnut Street, but none of the testifying witnesses, other than himself, actually testified about witnessing the shots fired at him.

¶ 79    At the hearing on the posttrial motion, the State provided the following reasons for why not calling Griffin and McMiller at trial was a sound trial strategy. First, Griffin was a known associate of the defendant, was with the defendant the entire night, and along with the defendant, failed to call the police to report the shooting. Thus, the State contended that Griffin's testimony would be suspect because his bias was evident. Second, the State argued that McMiller was also inherently biased as she was the defendant's cousin, her statement indicated that the gunshots toward the church were in response to gunfire already occurring outside of the Sigma house, the evidence established that the defendant was the first to fire a weapon in Greenlee's direction, and she did not see any of the shooters. Thus, the State argued that her testimony would not have corroborated the defendant's self-defense claim. Third, the State contended that the SEMO witnesses were notorious for intentionally avoiding service; several applications for service on the out-of-state witnesses had been issued, but even though it was confirmed that many of those witnesses lived on SEMO's campus, the authorities could not serve them (this was especially true for McMiller). After hearing the arguments, the trial court denied the defendant's posttrial motion.

¶ 80    We acknowledge that there was circumstantial evidence that there was shooting coming from the north side of the street and corroborating evidence in the form of the defendant's testimony. However, in light of Griffin and McMiller's relationship to the defendant, their failure to report the shooting, and their reluctance to talk to the investigating officers following the shooting, trial counsel's decision to not call them as witnesses at trial was not unsound. Griffin was with the defendant on the night of the shooting and when the defendant fled the area.

McMiller's testimony indicated the shooting toward the church may have been in response to gunfire already occurring, which was not favorable to the defendant's self-defense claim. She also did not see any of the shooters. The decision to call particular witnesses is a matter of trial strategy, and defense counsel need not call a witness if he reasonably believes that, under the circumstances, the individual's testimony is unreliable or would likely have been harmful to the defendant. *People v. Flores*, 128 Ill. 2d 66, 106 (1989). Accordingly, we cannot say that counsel's decisions were so unsound that counsel failed to conduct any meaningful adversarial testing.

¶ 81    Moreover, with regard to the unnamed witnesses, we agree with the State that it is telling that those witnesses remain unnamed and are not identified in the defendant's appellate brief. Further, the defendant's trial counsel was able to cross-examine Ingram about the particular statements that he allegedly made to others. Thus, we find that counsel's performance was not deficient as it fell within the range of trial strategy, which is generally immune from claims of ineffective assistance of counsel.

¶ 82                                    2. *Use of Force Instruction*

¶ 83    The defendant next contends that his trial counsel was ineffective for failing to object to the State's proposed jury instruction on the use of force in defense of a person, which removed language relating to the defense of others and justified use of force. The defendant argues that there were several people inside the Sigma house when someone inside shot a gun, there was circumstantial evidence that suggested that someone on the side of the street opposite the defendant shot in the direction of a church parking lot where many people had fled to escape, and at trial, the State argued that the defendant's motivation was to protect his friends. Although the jury found that the defendant did not have a reasonable belief in self-defense, the defendant

36

argues that they were denied the opportunity to determine whether another valid justification existed when there was some evidence of other justifications presented at trial. We disagree.

¶ 84 At trial, the defendant only asserted that he was acting in self-defense; he never asserted that he was acting to protect others as an affirmative defense. Because he was not asserting that affirmative defense, leaving the language regarding other justifications in the instruction would have only served to confuse the jurors. See *People v. Anderson*, 2012 IL App (1st) 103288, ¶ 40 (jury instructions are intended to convey the correct principles of law applicable to the evidence submitted, and they should not be misleading or confusing). Thus, counsel's performance in not objecting to that language being removed from the proposed jury instruction was not deficient where he was not asserting those affirmative defenses.

¶ 85 C. Limitations on Bell's Cross-Examination

¶ 86 The defendant next argues that his constitutional rights were violated when his trial counsel was denied an opportunity to cross-examine Bell, the State's witness, about Bell's expectation of leniency concerning his pending criminal case. The defendant notes that at the time Bell testified, he had an unrelated, pending misdemeanor charge and a pending petition to revoke previously-ordered supervision. The defendant argues that his counsel should have been allowed to inquire as to whether Bell's pending court supervision violation might have influenced his motive to testify favorably for the State.

¶ 87 A defendant has the constitutional right to confront the witnesses against him. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. This right encompasses cross-examining witnesses to reveal any bias, prejudice, or motivation to give false testimony. *People v. Baptiste*, 37 Ill. App. 3d 808, 811 (1976). However, the right to cross-examine is not absolute, as the trial court has discretion to impose reasonable limits on cross-examination to limit possible

harassment, prejudice, jury confusion, witness safety concerns, or repetitive and irrelevant questioning. *People v. Tabb*, 374 Ill. App. 3d 680, 689 (2007). The confrontation clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent the defense desires. *People v. Leak*, 398 Ill. App. 3d 798, 823 (2010). The scope of cross-examination is a matter within the court's discretion, and a reviewing court will not reverse that decision unless there was a clear abuse of discretion. *People v. Mosley*, 71 Ill. App. 3d 808, 811 (1979). An abuse of discretion occurs where the court's decision is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *People v. Blom*, 2019 IL App (5th) 180260, ¶ 35.

¶ 88 Here, at trial, the State orally made a motion *in limine* after learning that defense counsel was going to introduce Bell's prior conviction; Bell was initially charged with felony unlawful delivery of cannabis, then a misdemeanor charge of unlawful delivery of cannabis, and he pled guilty to the misdemeanor. Bell was on court supervision for the conviction, but there was a pending petition to revoke his supervision. Defense counsel sought to introduce the conviction to establish that Bell had a motive to lie in his testimony. The State contended that the conviction should be excluded because the petition was still pending, and there had been no promises of leniency made to Bell by the State in regard to that pending petition. The State noted that this was pure speculation because it had not even spoken to Bell about the petition. After hearing arguments, the trial court granted the motion *in limine*.

¶ 89 Where the State indicated that it had not spoken with Bell about his unrelated, pending misdemeanor charge; Bell had already given statements to law enforcement regarding what he witnessed that night before he was charged with the underlying cannabis offense; and the underlying cannabis charge was completely removed from his involvement in this case, we

38

cannot say that the trial court abused its discretion in restricting Bell's cross-examination. Moreover, although Bell indicated that he spoke to the State about his testimony in this case, he testified that the State never told him what to say. Accordingly, the court did not abuse its discretion in refusing to allow defense counsel to cross-examine Bell about his unrelated, pending charges.

¶ 90                    D. Evidence Relating to the Defendant's State of Mind

¶ 91    The defendant argues that the trial court abused its discretion in allowing the State to introduce the following evidence: a photograph of him and two others taken around the time of the incident that was captioned "Gang," a Snapchat photograph of him purportedly chugging a bottle of vodka before the incident, and a Snapchat message from him to Dunn after the incident wherein he reported that he was getting high.

¶ 92    On March 19, 2018, the defendant filed a motion *in limine*, wherein he sought to exclude this evidence because it was unduly prejudicial. Before commencement of the trial, the trial court heard arguments on this motion. The State first noted that its intention was not to use the photograph captioned "Gang" to show the defendant was in a gang. It instead wanted to use a video that was disseminated through the defendant's Snapchat story that included pictures and videos, including the picture captioned "Gang," because it primarily featured his thoughts that night. The State argued that the Snapchat story, which was posted on the night in question, highlighted the defendant's night and was relevant to show his state of mind at that time. The State contended that how the defendant started and ended that night was relevant to his claim of justified use of force, and the Snapchat story allowed the jurors to see what he was thinking as the night progressed. Regarding the photograph captioned "Gang," the State argued that it was relevant to show his strong loyalty to his SEMO acquaintances. The State argued that the

39

photograph of the defendant chugging a bottle of vodka showed that he had begun drinking before traveling to Carbondale, which was relevant to show his state mind and whether he was justified in using force. As for the Snapchat message, the State argued it was relevant to show that he was not concerned about the fact that he had just shot someone.

¶ 93 In response, the defendant noted that the photograph captioned "Gang" was a photograph of him and his two cousins, who were not involved in the incident. He argued that the caption should at least be removed before showing the photograph to the jury because gangs were irrelevant in the case, the use of the word "gang" was inflammatory, and it painted him in a bad light. He argued that the photograph of him drinking had an extremely low probative value, and it was prejudicial. Regarding the conversation with Dunn, the defendant indicated that Dunn had informed him that Dunn was in police custody, and he responded that he was going to get high for Dunn. He argued that the message was prejudicial because it showed that he was a pot smoker, had nothing to do with the case, and did not go to his state of mind during the incident. After hearing arguments, the trial court denied the defendant's motion *in limine*.

¶ 94 Decisions concerning the admissibility of evidence are within the sound discretion of the trial court, and the court's decisions may not be reversed absent an abuse of discretion. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Irrelevant evidence is inadmissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011).

40

¶ 95    Here, after carefully reviewing the record, we find that the trial court did not abuse its discretion in allowing the State to present the photographs and the Snapchat message to show the defendant's state of mind before and after the shooting. The two pictures were not stand-alone pictures but were instead part of a Snapchat story that was shown to the jury. As the defendant was arguing that he acted in self-defense, his state of mind during that time was relevant, especially when he testified that he was afraid for his life. Also, we note that the photograph captioned "Gang" was not presented by the State to affiliate the defendant with any gang. Instead, it was used to show his loyalty to the people who he was with that night. We note that, during the trial, the State made no mention of gangs and did not try to suggest that the defendant was involved in one. As for the defendant's argument that this was improper propensity evidence, we note that this evidence was not presented to show that because he drank vodka and smoked marijuana, he had the propensity to engage in criminal wrongdoing. Accordingly, we find that the court did not abuse its discretion in admitting this relevant evidence.

¶ 96                    E. Questioning of Potential Jurors at *Voir Dire*

¶ 97    The defendant next argues that the trial court erred in denying his counsel's proposed *voir dire* questions about the potential jurors' beliefs on transferred intent. Before *voir dire*, defense counsel requested that the trial court ask specific questions about whether the potential jurors could be fair and impartial as it related to self-defense to explore bias against self-defense and firearms. The State objected, arguing, *inter alia*, that it was an improper line of questioning at *voir dire* as the jury instructions would instruct them on the law. The court agreed that the questions at *voir dire* should not directly or indirectly concern matters of law or the jury instructions. The court then asked defense counsel if he would be agreeable to a specific question about whether the potential jurors could be fair and impartial if the issue of self-defense

41

was raised; the court indicated that was as far as it was comfortable going with that specific question. Defense counsel had no objection but requested permission to ask questions about self-defense when uninvolved third parties become the victims of the self-defense and delve into whether the jurors could find a defendant not guilty under those circumstances. The court denied that request, stating that it was getting too far into the law and the jury instructions. During *voir dire*, the court asked the potential jurors if they could be fair and impartial in a case where self-defense was raised.

¶ 98    The purpose of *voir dire* is to ensure the selection of an impartial panel of jurors who are free from bias or prejudice. *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993). The primary responsibility for conducting *voir dire* lies with the trial court, and the scope of the examination rests within its discretion. *People v. Terrell*, 185 Ill. 2d 467, 484 (1998). The trial court possesses great latitude in deciding what questions may be asked during *voir dire*. *Id.* On review, an abuse of the court's discretion will be found only when the record reveals that the court's conduct thwarted the selection of a fair and impartial jury. *Id.* The court has a right to place reasonable limitations on *voir dire*. *People v. Lanter*, 230 Ill. App. 3d 72, 75 (1992). A court properly refuses questions designed to educate the jurors on defendant's theory of defense and ensure the selected jurors are receptive to that defense. *People v. Reeves*, 385 Ill. App. 3d 716, 730 (2008). According to Illinois Supreme Court Rule 431(a) (eff. July 1, 2012), questions asked during *voir dire* should not directly or indirectly concern matters of law or instructions. Allowing defendant to question prospective jurors regarding any predisposition to a self-defense claim goes to an ultimate question of fact and would serve no purpose other than to improperly attempt to preeducate and indoctrinate the jurors as to defendant's theory of the case. *People v. Karim*, 367 Ill. App. 3d 67, 92-93 (2006).

42

¶ 99   Here, the defendant argues that the entire case rested on the notion of transferred intent, and he was severely prejudiced by not having the opportunity to explore the potential jurors' thoughts on this pivotal issue.  He argued that jury members could have rejected the notion that he should be found not guilty for killing an innocent person when he acted in self-defense at the time.  In denying the request, the trial court stated that this line of questioning was getting too far into the law and the jury instructions.  We do not find that this was an abuse of discretion as Rule 431(a) makes clear that questions asked during *voir dire* should not directly or indirectly concern matters of law or instructions.

¶ 100                              F. Excessive Sentence

¶ 101   Lastly, the defendant argues that his sentence was excessive where the finding that he discharged a firearm that caused great bodily harm enhanced his sentence more than once and where the mitigating factors outweighed those in aggravation.  A sentence will not be disturbed on appeal absent an abuse of the sentencing court's discretion.  *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 15.  Its sentencing decision is entitled to great deference because the court is generally in a better position to determine the appropriate sentence, having the opportunity to weigh such factors as defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age.  *Id*.  A reviewing court may not substitute its judgment for that of the trial court merely because it would have weighed these factors differently.  *People v. Stacey*, 193 Ill. 2d 203, 209 (2000).  A sentence within the statutory limits will not be considered excessive unless it greatly varies with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense.  *Id*. at 210.

¶ 102   Where mitigating evidence was presented, it is presumed the trial court considered it, absent some contrary indication other than the sentence imposed.  *Etherton*, 2017 IL App (5th)

43

140427, ¶ 29. While the sentencing court may not ignore evidence in mitigation, it may determine the weight to attribute to it. *People v. Markiewicz*, 246 Ill. App. 3d 31, 55 (1993). The spirit and purpose of the law are promoted when the court's sentence reflects both the seriousness of the offense and gives sufficient consideration to defendant's rehabilitative potential. *Etherton*, 2017 IL App (5th) 140427, ¶ 28. The seriousness of the offense is one of the most important factors for the court to consider. *Id.*

¶ 103 In sentencing, a double enhancement occurs when either (1) the same factor is used as an element of an offense and as a basis for imposing a harsher sentence or (2) the same factor is used twice to elevate the severity of the charged offense. *People v. Guevara*, 216 Ill. 2d 533, 545 (2005). The prohibition against double enhancement is a rule of statutory construction, which is premised on the assumption that the legislature considered the factors inherent in the offense in determining the appropriate range of penalties. *Id*. Where the legislature clearly expresses its intention for there to be a double enhancement, there is no prohibition. *Id*. When determining whether the legislature intended a double enhancement, we look to the statute itself as the best indication of the legislature's intent. *People v. Phelps*, 211 Ill. 2d 1, 15 (2004). The best indication of legislative intent is the statutory language, given its plain and ordinary meaning. *Id.* As the double enhancement rule involves statutory construction, our standard of review is *de novo*. *Id*. at 12.

¶ 104 Here, the defendant contends that a Class 3 aggravated battery charge was enhanced to a Class X aggravated battery with a firearm charge based on the finding that he discharged a firearm that injured another person, and the State enhanced that to felony murder based on the same finding. The defendant also contends that the trial court considered this finding as an aggravating factor to add 15 years to the minimum sentence and to enhance his sentence to 25

44

years based on the firearm enhancement. He argues that a conviction for the discharge of a firearm that causes an injury should never have resulted in a sentence outside of the 6- to 30-year range for aggravated battery with a firearm. He further argues that the court improperly considered, as an aggravating factor, the use of a firearm when it sentenced him, and the court failed to give adequate consideration to the mitigating factors, such as his remorse, unlikelihood of recidivism, the hardship on his family, and his lack of a criminal background.

¶ 105   The defendant was convicted of, and sentenced for, first degree murder. The sentencing range for first degree murder is 20 to 60 years. 730 ILCS 5/5-4.5-20(a)(1) (West 2018). In addition, a mandatory sentence enhancement of 25-years-to-natural-life imprisonment attaches to the sentence if, during the commission of the murder, defendant personally discharges a firearm that proximately causes great bodily harm or death to another person. *Id.* § 5-8-1(a)(1)(d)(iii). The trial court sentenced the defendant to 60 years' imprisonment (35 years for first degree murder and 25 years for the mandatory firearm enhancement). Initially, we note that the defendant was not charged with a Class 3 felony of aggravated battery; he was first charged with a Class X felony of aggravated battery with a firearm and a Class 1 felony of aggravated discharge of a firearm. Thereafter, he was charged by indictment with first degree murder based on felony murder. The sentence enhancement for the first degree murder conviction was a mandatory component of a defendant's sentence because the jury found that the defendant personally discharged a firearm that proximately caused great bodily harm to another person. The legislature has made clear an intention to enhance the penalty for this crime based on the use of a firearm, and this court will not overrule the legislature, even where it may constitute a double enhancement. See *People v. Sharpe*, 216 Ill. 2d 481, 530 (2005).

¶ 106 As for the defendant's argument that his sentence was excessive, we note that it was within the allowable statutory range for first degree murder. In fashioning this sentence, the trial court noted that it considered the PSI; the written victim impact statements; the victim impact testimony; the four letters that were submitted by the defendant, the trial testimony, and exhibits; the fact that the defendant was always respectful in court; his background and accomplishments in life, including the fact that he was a leader in school, made good grades, played sports, obtained a college scholarship to play football, was attending college at the time of the incident, and was attempting to better himself; his statement in allocution where he expressed his remorse; and counsels' arguments in aggravation and mitigation. In aggravation, the court considered the need to deter others. In mitigation, the court considered whether the defendant contemplated that his criminal conduct would cause or threaten serious physical harm to another, whether he acted under strong provocation, whether there was substantial grounds tending to excuse or justify his criminal conduct, the fact that he had no criminal history, whether the criminal conduct was the result of circumstances unlikely to reoccur, his character and attitude indicating that he was unlikely to commit another crime, and whether imprisonment would entail excessive hardship to his family since he helped care for his younger siblings.

¶ 107 All of these possible mitigating factors were presented to the trial court at sentencing, in the PSI report, and during defense counsel's arguments at the sentencing hearing. The court specifically mentioned the mitigating factors that were identified by the defendant in his appellate brief and indicated that it had considered those factors in determining the defendant's sentence. In the face of this record, there is nothing indicating that the court did not consider these mitigating factors or considered improper factors in aggravation. While the defendant contends that his sentence does not reflect a proper weighing of the above referenced mitigating

46

factors, this argument essentially asks us to substitute our own judgment for that of the trial court. However, as noted above, this would be an improper exercise of our powers as a reviewing court. Moreover, although the court noted that multiple gunshots were fired, there was no indication that it considered this as evidence in aggravation. Accordingly, we find that the court did not abuse its discretion in sentencing the defendant to 60 years' imprisonment.

¶ 108                                  III. CONCLUSION

¶ 109   For the foregoing reasons, we affirm the judgment of the circuit court of Jackson County.


¶ 110   Affirmed.