NOTICE
Decision filed 03/24/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240127-U

NO. 5-24-0127

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 16-CF-117 |
| | ) | |
| TRAVIS T. TYLER, | ) | Honorable |
| | ) | Michael A. Fiello, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE HACKETT* delivered the judgment of the court.
Justices Barberis and Clarke** concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's dismissal of the defendant's post-conviction petition at the second stage of proceedings under the Post-Conviction Hearing Act is affirmed where the defendant failed to make a substantial showing of his actual innocence claim, and the defendant was not denied his right to reasonable assistance of postconviction counsel.

¶ 2    Following a jury trial, the defendant, Travis Tyler, was convicted of one count of first degree murder (720 ILCS 5/9-1(a)(3) (West 2016)), one count of aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), and two counts of aggravated discharge of a firearm (*id.* § 24-1.2(a)(1)). The jury also found that, during the commission of the murder, the defendant personally discharged a

_____

*Justice Welch was originally assigned to the panel. After the death of Justice Welch, Justice Hackett was substituted on the panel and has read the briefs.
**Justice Moore was originally assigned to the panel prior to his retirement. Justice Clarke was substituted on the panel and has read the briefs.

1

firearm that proximately caused great bodily harm to another person. The trial court sentenced the defendant to a total of 85 years' imprisonment by including a mandatory firearm enhancement and ordering consecutive sentences on all four counts. Thereafter, the trial court vacated the defendant's convictions for aggravated battery with a firearm and aggravated discharge of a firearm, leaving the defendant with a 60-year total sentence, which included a 35-year sentence for first degree murder and the 25-year mandatory firearm enhancement.

¶ 3    On direct appeal, the defendant argued, *inter alia*, that he received ineffective assistance of trial counsel where his counsel failed to call certain witnesses who would have corroborated his claim of self-defense and failed to offer a jury instruction on the defense of others or on justified use of force. See *People v. Tyler*, 2021 IL App (5th) 180476-U. This court affirmed the defendant's conviction and sentence on direct appeal. See *id.*

¶ 4    In his postconviction petition, the defendant argued a claim of actual innocence and ineffective assistance of trial counsel for failing to call certain witnesses and failing to propose certain jury instructions. On December 29, 2023, the trial court dismissed the defendant's postconviction petition at the second stage of hearings under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)), finding that the defendant's claims regarding ineffective assistance of trial counsel were barred either by *res judicata* or forfeiture, and that the defendant had failed to make a substantial showing of actual innocence. The defendant appeals, claiming (1) that he made a substantial showing of actual innocence and (2) that postconviction counsel failed to provide reasonable assistance, as required by Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), where counsel did not file a Rule 651(c) certificate. For the following reasons, we affirm.

2

¶ 5                                    I. BACKGROUND

¶ 6     The defendant's conviction and sentence were previously affirmed on direct appeal. See *People v. Tyler*, 2021 IL App (5th) 180476-U. Because the facts underlying the defendant's conviction were set forth in detail in that order, we recount here only those facts necessary to understand and resolve the issues raised in this postconviction appeal.

¶ 7     On March 26, 2016, the defendant, who was a student at Southeast Missouri State University (SEMO), traveled with his cousin, Anthony Griffin, and his cousin's friend, Calvin White, from Cape Girardeau, Missouri, to Carbondale, Illinois. They planned to attend a "probate party" for the Phi Beta Sigma fraternity at Hangar 9 (a nightclub in Carbondale). At around 2 a.m. on March 27, the trio left Hangar 9 and went to an after party at the "Sigma House," a house located on West Walnut Street. While there, a physical fight broke out in the living room, and gunshots were fired inside the overcrowded house. Shortly after that, gunshots were fired outside the house, resulting in the injury of Nehemiah Greenlee, a fellow partygoer, and the death of Timothy Beaty, a neighbor who was killed when a stray bullet pierced his apartment wall. The defendant and his codefendant, John Ingram, were subsequently arrested and charged for the shooting.

¶ 8     Prior to trial, on May 9, 2017, the defendant filed a request for the trial court to issue a certification to secure the attendance of Destiny Leonard from out of state to testify at the defendant's trial. The trial court issued the certification that same day. On March 5, 2018, the defendant filed a motion to endorse witnesses, notifying the State that Leonard was among the witnesses that could be called to testify at the defendant's trial. At a pretrial hearing on March 16, 2018, the State mentioned that it had "sent out-of-state subpoena applications to the State of Missouri under the Uniform Act on a number of occasions" and that there were "a number of

3

witnesses that [had] not been served in this case and *** [were] clearly ducking service." The defendant's trial attorney also noted that John Ingram, the defendant's codefendant, had since "entered into an agreement with the State's Attorney's Office." The State confirmed that, under that agreement, "Ingram [was] obligated to testify on behalf of the State" against the defendant at the defendant's trial.

¶ 9    During the trial, which ran from March 19, 2018, to March 27, 2018, the following facts relevant to this appeal were adduced. The defendant was represented at trial by two private attorneys.[1]

¶ 10    Jeffrey Withrow, an officer with the Carbondale Police Department who was dispatched to the shooting location, testified that he assisted other officers in canvassing the area to locate witnesses and evidence. As he approached 334 West Walnut, he noticed a bullet strike mark on the south side of an apartment. He first attempted to contact the residents by knocking on the door. When he did not receive a response, he looked through the window at the top of the door and noticed a man lying on the floor. Withrow opened the unlocked door and entered the residence. Withrow noticed that the man was pale, his eyes and mouth were both open, and he did not appear to be breathing. Withrow checked for a pulse and realized that the man was deceased. The man was identified as Beaty.

¶ 11    James Minckler, a crime scene investigator with the Illinois State Police, testified that he was called in to process the scene at 334 West Walnut. Beaty had a gunshot wound through his right rib cage, and no exit wound. Minckler searched the apartment for the origin of the bullet and discovered a hole in the corner of the wall in the main room, which appeared to lead outside. He

---

[1]For purposes of clarity, we will refer to both attorneys throughout this appeal as the defendant's "trial counsel."

went outside and saw a hole in the metal siding on the corresponding exterior wall. Using a trajectory rod with an attached laser, he determined that the bullet originated from across the street in the South Beveridge Street area, which was just south of West Walnut. Thomas Gamboe, an Illinois State Police (ISP) forensic scientist, testified that the projectile recovered from Beaty was a .40 caliber bullet fired from the same gun that fired two other bullets found around West Walnut. James Jacobi, a forensic pathologist, testified that he performed Beaty's autopsy, and confirmed that Beaty died by gunshot wound.

¶ 12    Besides Withrow, several officers were dispatched to the Sigma house area for the shooting. One of these officers was ISP trooper Blake Harsy, who testified that, at the Sigma house, he observed a loaded chrome handgun magazine on the floor near a brick fireplace, as well as a live .40 caliber cartridge on the fireplace ledge.

¶ 13    Lee Stewart, a Carbondale Police Department patrol detective who was a crime scene technician at the time of the shooting, also testified that he was dispatched to the Sigma house for the shooting. After the house was secure, he went to other locations in the area to search for evidence and preserve the crime scene. In the intersection of West Walnut Street and South Beveridge, he found eight spent .40 caliber Smith & Wesson R-P shell casings, seven 9-millimeter Corbon Ruger shell casings, and one live .40 caliber shell casing. After discovering the shell casings, Stewart expanded the search area to include the yards between 402 and 334 West Walnut. In this area, Stewart found a black and silver Smith & Wesson .40 caliber magazine loaded with 14 rounds. He also found a spent .40 caliber Winchester shell casing in front of 322 West Walnut (east of the Sigma house, on the north side of the road) which was different from the others previously found. He acknowledged that before officers were able to secure the area, people had been running and driving through there, and consequently, some of the shell casings could have

5

been kicked, walked on, or driven over. Stewart admitted that he had not searched by the church or along the church wall.

¶ 14    Seth Moorman, an officer with the Carbondale Police Department, was also dispatched to the 402 West Walnut Street area. After the initial response, Moorman returned later that morning to assist with the search warrant. Moorman "stayed specifically *** in 402 West Walnut" and did not canvass elsewhere for evidence. Kevin Geissler, a Sergeant with the Carbondale Police Department, was another officer involved in the shooting investigation. Geissler testified that, although he investigated claims that individuals on the north side of the street were holding firearms during the shooting, he was unable to find any evidence corroborating those claims.

¶ 15    During a sidebar conversation abruptly taken in the middle of Sergeant Geissler's redirect examination, the State accused defense counsel of attempting to "back door" introduce into evidence hearsay statements of witnesses they knew had not been able to be served with subpoenas, and would therefore not be testifying at trial, by asking testifying officers whether they had ever spoken with those unserved witnesses. In particular, the State commented that defense counsel knew "that the State tried to serve Destiny Leonard on multiple occasions[,]" that the State had great difficulty coordinating with Missouri courts and serving Missouri witnesses, and that the State was ultimately "unable to secure at least 16 people from the State of Missouri." The trial court ruled that while defense counsel could ask about steps officers took during the investigation, the court would sustain hearsay objections to testimony detailing unavailable witnesses' statements.

¶ 16    Jesse Ital, an officer with the Carbondale Police Department, testified that, on March 30, 2016, he went to the St. Francis Xavier Church to search for evidence related to the shooting. The church was within the 400 block of West Walnut. He had been instructed to search the area for

6

ballistic or ammunition evidence based on information obtained from a witness. Officer Ital and another officer spent 30 minutes to one hour searching for evidence in the church's flower garden area, and at the walls of the church buildings. Approximately five feet up on one of those walls, Officer Ital observed a discoloration in the grout between two of the bricks, which, based on his experience as a police officer, he believed to be a bullet strike. Standing on the sidewalk, about eight feet back from the wall, he also discovered a bullet at his feet. Officer Ital believed the bullet had not been found until March 30, 2016, three days after the incident, because it looked like a divot in the concrete. He acknowledged that his department could have missed other markings and bullets in that area. He noted that there was no way to tell where the bullet came from but acknowledged that it could have come from 334 or 402 West Walnut.

¶ 17      Dominique White, a student who had attended the Sigma party, testified that after the initial shooting inside the Sigma house, she and her friend attempted to run toward the back exit of the house, but eventually left with a crowd of people through the front door. White had only been outside for a couple seconds when she heard approximately four to five gunshots. She instinctively looked to where the sound of the shooting was and saw someone in a black outfit shooting from the crowd across the street from the Sigma House. White admitted that she did not know what had been going on outside before she walked out of the Sigma House's front door, and that although she did not see anyone shooting on the north side of West Walnut (the Sigma House side of the street), she did not know too much about what was happening on the north side because she was looking toward the south side of the street.

¶ 18      Officer Rebecca Mooney, a crime scene specialist with the Carbondale Police Department, searched the 300 and 400 block of West Walnut Street just after the shooting. She testified that she and other officers found and properly collected shell casings and one live round from South

Beveridge, a Smith & Wesson magazine and a live round of ammunition from 402 West Walnut, a Smith & Wesson magazine with some live rounds inside it from the grass between 402 and 334 West Walnut, and a spent .40 caliber Winchester shell casing from the sidewalk in front of 322 West Walnut. Mooney admitted that "things could [have been] kicked [or] pushed," and that she "couldn't be certain" from the ballistic evidence found on South Beveridge Street that the shooter there was not moving around.

¶ 19　Anthony Williams, a sergeant with the Carbondale Police Department, acknowledged that he never asked any witnesses about the bullet strike on the church wall or about whether there was gunfire going in the direction of the church, although he did ask them generally about the shooting they had observed that night. However, he explained that the fact that there was a bullet strike on the church wall did not necessarily conflict with the information that he had obtained from witnesses. He explained that he was not surprised that none of them saw the bullet strike the church, because there was a lot going on that night.

¶ 20　Brandon Weisenberger, a detective with the Carbondale Police Department, acknowledged that no witness told him that gunfire was going south, away from the Sigma house, and testified that he did not believe that anyone from his office talked with witnesses about the evidence obtained from the church area. Detective Weisenberger also acknowledged that the bullet from the church area was the first evidence collected indicating that gunfire had been directed south. He explained that the evidence indicated that there was a spray of gunfire going in multiple directions.

¶ 21　Joshua Bell, Greenlee's friend and a student at Southern Illinois University-Carbondale (SIU) in March 2016 testified that he attended the Sigma House party. After gunshots broke out in the house, Bell ran out the back door and toward the front of the house, where he heard more shooting coming from across the street. Bell saw two individuals shooting and identified one of

8

them as the defendant. He testified that the defendant shot approximately five times toward the Sigma House from across the street. Bell could not clearly see or identify the other shooter. Bell testified that "less than two minutes" had passed between the shooting inside the house and the shooting outside. When police arrived, Bell pointed them toward the group of people gathered on the church parking lot, since he believed they were "involved with the shooting." Bell denied ever seeing his friend, Greenlee, having or shooting a gun that night.

¶ 22    Anthony Jones, a friend of Greenlee and Bell, and a student at SIU in March 2016 testified that, after the shooting inside the house, everyone scattered and started running out. As the house started to empty out through the back door, Jones stood by the front door with Greenlee. Two individuals, one of them being the defendant and the other being a Cardinals-hoodie-wearing individual, approached Jones and Greenlee and told them to open the door. Jones told them to go through the back door but eventually opened the front door for them. The man in the Cardinals hoodie turned around and ran out the back door, but the defendant exited out the front door, pushing into Jones's left shoulder. Jones shrugged this off, but Greenlee confronted the defendant, told him that there was no need for pushing, and then pushed him in return. The defendant and Greenlee then got into a verbal argument on the porch and indicated that they would fight. When Jones got between them, the defendant pulled toward his waist and displayed the handle of a gun. The defendant said that he was going to kill Jones and Greenlee, and Jones told him to put the gun down and fight. In the scuffle, Jones and Greenlee ended up in the yard between the Sigma house and 334 West Walnut. The defendant ran away down South Beveridge.

¶ 23    About five seconds later, the defendant came back with another individual, and Jones heard shots. The defendant was in the street when this occurred. At first, the shots were fired toward the street. Then Jones noticed that the subsequent shots were angled toward him and Greenlee, and

9

that some of them were in the air. The shots were coming from the defendant's gun. Although the individual with the defendant was also shooting, Jones did not get a good look at that person because he was solely focused on the defendant. Jones froze for about five seconds and then felt Greenlee push him. He turned around and saw Greenlee lying on the ground. Greenlee then got up and went back inside the Sigma house. The defendant and the other individual ran off. Jones testified that neither he nor Greenlee had a gun that night or shot at anyone. He acknowledged that, in his March 27 statement, he wrote that, during the party, he had to kick out a group of people who were fighting inside the house, and they went around the side of the house and started shooting. Then, they reentered through the back. However, he denied writing that the individuals started shooting at the side of the residence, and instead claimed that he had to kick them out, people started running out of the house, and he heard gunshots. This occurred after gunshots were fired inside the house, and the defendant was still inside at this time. Jones acknowledged that the defendant's threat to kill them was not included in his police statement. He did not remember saying that the person shooting outside was standing in the church parking lot.

¶ 24    Greenlee testified that, after the shooting inside, he and Jones went to the front door and locked it because they did not want anyone coming back in through that door. The defendant and his friend approached, so Jones opened the door to let them out. However, the friend ran out of the living room toward the back door. The defendant exited through the front door, and as he was exiting, he shoved Jones. Greenlee reacted and told the defendant that he did not have to shove. They then got into an argument, and the defendant acted like he was pulling out a gun. Greenlee did not see a gun, so Greenlee thought that the defendant was just acting like he had one. The altercation moved to the front porch, and they all ended up in the front yard. The defendant eventually ran off across the street onto Beveridge Street, and Greenlee and Jones decided to leave.

10

¶ 25    Greenlee saw the defendant run approximately 15 to 20 feet to either a black or red Charger and open the vehicle's trunk. He then saw people running down Beveridge Street, and he heard gunshots; the defendant was shooting in his direction. As soon as he saw the defendant shooting, he pushed Jones to the ground. He saw the defendant shoot approximately four shots at him, and one of the shots hit him in his stomach on his side. He believed that the defendant was aiming at him because the defendant was looking at him while shooting. There was another shooter with the defendant, whom Greenlee was never able to identify. Greenlee acknowledged that the defendant was standing on West Walnut and not in the church parking lot. After getting shot, Greenlee ran toward the house, fell on the porch, and crawled into the living room. He did not have a gun on him that night, and he did not shoot a gun at anyone. He acknowledged that when the investigating officer asked him to identify the shooter from a series of photographs, he stated, "maybe it's number four," which was the defendant. Although his identification was not as confident as his testimony, he had been in the hospital at the time that he was asked to identify the shooter, and he now had no doubt that the defendant was the person who had shot him.

¶ 26    Ingram testified that he made an agreement with the State to testify in exchange for immunity; he had initially been charged with murder, but ultimately pled guilty to aggravated discharge of a firearm and was sentenced to nine years' imprisonment. At the time of the shooting, Ingram was a student at SEMO and had gone to Carbondale for the fraternity party. He drove his vehicle to Carbondale with his Rogue 9-millimeter firearm in the trunk. At some point, he left the Sigma house to retrieve his gun because some friends were borrowing his car. He then reentered the house with his gun in a holster on his hip. When Ingram heard shots fired inside the house, he ran into a bedroom. When things were clear, he exited the house through the open front door and

ran across the street. While exiting, he noticed four men standing in front of the door, one of whom had a revolver.

¶ 27     As Ingram was crossing the street, he heard one or two gunshots coming from "ahead of him" in the middle of the street; he explained that although he was heading south, he kept turning back around to see what was happening behind him. The shots were being fired in the direction of the Sigma house. Ingram crossed the street, turned back around toward the Sigma house, and fired his gun, as he felt threatened. He did not see anyone pointing a gun at him, and he did not remember whether anyone fired in his direction. He initially started shooting in the direction of the house but then started shooting into the air because of the gun's recoil. The other person was also still shooting at this time; that person was on his side, approximately two to three feet away. He then turned away from the house and started running toward a friend's vehicle. As he turned, he noticed the defendant running down the street away from the house and saw that the defendant also had a gun in his hand. He eventually got into a car with three women, and the four drove back to Cape Girardeau. Ingram did not remember telling his friends that he acted in self-defense.

¶ 28     Eric Corey, an ISP forensic scientist, testified that a partial DNA profile was obtained from the magazine discovered on the grass between the Sigma house and 334 West Walnut, but it did not match the DNA profiles of the defendant or Ingram. However, he could not say that any of those individuals did not touch the magazine as some people do not leave DNA when they touch an item. Angela Horn, an ISP forensic scientist, testified that the projectile found near the church administrative building was a .38-caliber bullet, but that she did not know whether it was fired from a 9-millimeter or a .38-caliber revolver. Christopher Robinson, a private forensic consultant, testified that he examined the bullet discovered near the church and concluded that it was a .38-caliber Remington bullet which could have been fired from one of three different types of

12

revolvers: a Smith & Wesson, a Ruger and Taurus .38-Special, or a .357-Magnum. He denied that the bullet had been fired from a 9-millimeter.

¶ 29    The defendant, who had been a 21-year-old student at SEMO in March 2016 testified that he rode with his cousin, Anthony Griffin, and Griffin's friend, Calvin White, in Griffin's vehicle to attend the Sigma party in Carbondale. They drank in the dorms before leaving for Carbondale. The trio initially went to Hangar 9, and after an altercation broke out there, the defendant intervened and broke the fight up. Eventually, the defendant, White, and Griffin left for the Sigma house party. Griffin parked on the left side of South Beveridge and the trio entered the Sigma house party. Upon their arrival, there were less than 15 people inside the front room, but the house quickly became "packed." The defendant did not consume any alcohol while there. He noticed that Ingram entered the house by himself and left shortly afterwards. A physical fight broke out in the living room, and the defendant recognized that some of the same people involved in the living room fight had been involved in the Hangar 9 altercation. The defendant recalled that, as the fight escalated, "everyone started pushing and falling." The defendant fell and was trampled on, resulting in a wrist injury. While on the ground, he heard two or three gunshots fired inside the house, which was "packed wall to wall." The defendant did not see who had fired the gun. The house became chaotic, and the defendant crawled into a nearby bedroom for safety.

¶ 30    About 30 seconds later, after the living room had emptied out, the defendant decided to exit the house through the front door, which was open. As he neared the door, two individuals approached him and told him that he could not "leave out this fucking front door." At the time, the defendant did not know who they were; he later learned that they were Greenlee and Jones, and that Greenlee had been the one who spoke to him. The defendant responded, "move the fuck out of my way," and told the men that he had "to get the hell up out of this house." At that point, the

13

defendant still feared for his safety. Although Greenlee and Jones were still standing in the doorway, the defendant squeezed himself through an opening, accidentally bumping Jones with his left shoulder. Greenlee then pushed the defendant from behind, making him stumble down the porch into the grass. As the defendant caught his balance, Greenlee, who was still on the porch, said, "you ain't got to push him like that." The defendant turned around and asked, "What?". Greenlee then raised his shirt up, revealing a revolver in his waistband, and repeated, "you ain't got to push him like that." The defendant then "went into defensive mode," walking backwards towards West Walnut with his hands up so that Greenlee would not shoot him.

¶ 31    When the defendant made it to the corner of West Walnut and South Beveridge, Greenlee, who was standing in the grass in front of Beaty's residence, 334 West Walnut, pulled out his revolver and told the defendant, "Talk that shit now. Talk that shit now." Greenlee then shot twice in the defendant's direction. The defendant knew this because he saw the "sparks" and felt and heard the bullets fly past him. The defendant, who was armed himself, grabbed his own firearm, a Glock, from inside his waistband, and returned fire in Greenlee's direction until his magazine was empty. The defendant testified that he believed he was going to die. Far behind him, the defendant heard someone firing their own weapon. The defendant then ran back to Griffin's vehicle. As he ran, he saw Ingram running to Ingram's own vehicle. Griffin, White, and the defendant then drove back to SEMO, stopping for food along the way at White Castle. The defendant denied ever telling Greenlee or Jones that he would kill them, and similarly denied going to the vehicle to retrieve his firearm. He explained that he always took his firearm with him everywhere for his, and his cousin's, protection. He admitted that his firearm was fully loaded.

¶ 32    The defendant acknowledged that, as they were leaving the area, two police cars passed by, but he did not stop and talk to them because he wanted to get to safety. He did not call 9-1-1

14

at that time because he had seen that police were already on their way. The defendant did not contact police or visit a police station to inform them that he had been shot at because he still felt threatened. The defendant never contacted police because, at the time of the incident, he was 21 and had "never had an encounter *** in 21 years with the law enforcement." He insisted that he did not know "the procedure" to follow after one had been shot at. He did not call 9-1-1 later on because he did not "want anyone to reverse [his] words around," and instead contacted a legal team. On the night the defendant learned of Beaty's death, he was back in St. Louis with his parents.

¶ 33    After deliberation, the jury found the defendant guilty of one count of first degree felony murder, one count of aggravated battery with a firearm, and two counts of aggravated discharge of a firearm. The jury also found that, during the commission of the murder, the defendant personally discharged a firearm that proximately caused great bodily harm to another. The trial court ordered that a presentence investigation report (PSI) be completed.

¶ 34    On April 26, 2018, the defendant filed a motion for judgment of acquittal, or, in the alternative, a new trial. In that motion, the defendant alleged, *inter alia*, that he had been improperly convicted of felony murder because the predicate felonies relied upon to convict him of felony murder were inherent in the act of murder with which he had been charged, and did not involve conduct with an independent felonious purpose, other than the act of killing itself. The defendant thus asked the trial court to enter a judgment of acquittal notwithstanding the verdict, or, in the alternative, to order a new trial. Shortly thereafter, on April 30, 2018, the defendant retained new counsel.[2]

---

[2]For clarity purposes, we will henceforth refer to the defendant's new attorney as his "posttrial counsel," although posttrial counsel also represented the defendant on his postconviction petition. In this appeal, however, the defendant is represented by the Office of the State Appellate Defender (OSAD).

¶ 35    On June 18, 2018, through his newly retained posttrial counsel, the defendant filed a supplement to his motion for judgment of acquittal. In that supplement, the defendant argued, *inter alia*, that his trial counsel had provided unreasonable assistance where they "failed to call multiple witnesses at trial who would have corroborated a justified use of force defense" through testimony that "multiple shots were fired *** in their direction and [in] the direction of [the] defendant." The defendant "anticipated that some of these witnesses [would] testify [to the same] at the hearing" on this motion. The specific witnesses to whom the defendant referred were not named in his original motion, or in his supplemental filing.

¶ 36    In its June 27, 2018, response to the defendant's motion and supplement, the State contended that, "on information and belief, via an email communication from the defendant's counsel," it believed that the defendant was "referring to Anthony Griffin, Lena McMiller[,] and Destiny Leonard." Specifically regarding Leonard, the State argued that trial counsel's failure to call her as a witness at trial was plausibly an active trial strategy decision, as Leonard was apparently "a known associate and friend to the defendant *** [whose] bias toward the defendant was obvious[,]" she "never identified anyone shooting, or *** from where the shots were coming[,]" she "later retracted some of [her] statements[,]" and she "admitted to law enforcement that she had 20/200 vision." The State also argued that "these witnesses were notorious for intentionally avoiding service," that "[f]ailure of an authority to serve a witness [could] hardly be attributed to trial counsel," and that the defendant's grievance thus could not fairly serve as evidence of trial counsel's ineffective assistance.

¶ 37    That same day, the trial court held a hearing on the defendant's motion and supplement. The defendant's posttrial counsel presented testimony from two witnesses who had not testified at trial, Anthony Griffin and Lena McMiller. Griffin testified that he rode to the Sigma house party

16

with the defendant, who was his cousin with whom he was very close. The Sigma house was crowded with hundreds of people standing essentially shoulder to shoulder, and loud music was blasting. Upon hearing approximately three gunshots fired inside the house, Griffin ran out the front door to his vehicle, which was parked across the street from the Sigma house. As he ran, he saw "bullets ricocheting off the ground" and heard gunshots. While he was waiting for the defendant near his car, as they had lost each other in the chaos, he observed two shooters. One man was on the front lawn of the Sigma house, and the other was on the right side of the Sigma house. Both men were shooting away from the house, across Walnut Street and toward the church parking lot, where a group had gathered. Griffin testified he heard "at least four to ten" gunshots come from the Sigma house shooters. Griffin was scared for his life and believed he would die that night.

¶ 38    Griffin only spoke to the defendant's trial counsel once, approximately one to two months after the incident, and gave trial counsel essentially the same information. Griffin explained that trial counsel told him that they would "meet up" later, but this next meeting never occurred. Griffin was not called as a witness at trial. Griffin affirmed that he cared about his cousin and had known him a long time, but denied that he would "say anything to help him out." Griffin did not call the police before leaving Carbondale, assuming that because he "could hear the sirens[,]" they were "around the corner already." He did not stay to talk to police because he feared for his life. Griffin admitted that the first thing he and the defendant did after leaving Illinois was to go and eat at White Castle. Griffin did not recall talking to law enforcement about the incident. Griffin acknowledged that, although he knew the defendant—his cousin—had been jailed and charged with first degree murder, he never called the police or the defendant's trial counsel.

¶ 39    Lena McMiller testified that, in March of 2016, she was a student at SEMO. She travelled with some fellow students to the Sigma house party. She attended the party "for, like, two minutes

literally and then left" because the house was so crowded that "[e]verybody was standing on top of each other[,]" the party was more male-heavy than usual, and the environment "was just really tense." McMiller left and walked to the church parking lot directly across the street from the Sigma house. She and her friends, including Leonard, "were standing on the parking lot just talking and everything," and after a while, she heard two to three gunshots and saw people running out of the house. They heard more gunshots, and "took off running." As she ran to her vehicle, a bullet flew past her and hit the church wall. She then changed directions and continued running to her vehicle. Once she reached her vehicle, she immediately left the area. McMiller believed that she heard "about 10 to 15" gunshots. She was sure that "a lot" of shots were being fired in her direction. Between the time she heard the initial gunshots inside the Sigma house and when she heard the rest of the gunshots being fired in her direction, she did not hear any other shots. McMiller did not see anyone holding a gun that night but was scared for her life.

¶ 40    McMiller talked to the defendant's trial counsel once approximately one month after the incident, and then once right before the trial started, and gave counsel the same information. McMiller admitted that she was the defendant's cousin, that she did not call the police after the incident, and that the police had to call her themselves before she talked to them. She also admitted that she had been subpoenaed by the State's attorney and had appeared in front of the Cape Girardeau County circuit court in March 2017 that she remembered the State's attorney being there, that she knew he was prosecuting the defendant's case, and that she still did not stay to talk to the State's attorney after the hearing had concluded. McMiller acknowledged that her address had not changed during the relevant period of time but denied awareness of six out-of-state subpoenas sent to her. She denied "ducking and dodging" subpoenas and only recalled being served twice. McMiller insisted that she would have testified at trial if she had been served or

asked to come to court, but that neither occurred. After McMiller stepped down, the trial court asked the defendant's posttrial counsel if he had any other witnesses to present. Posttrial counsel commented that although he "had planned on calling one other witness," Leonard, she had not come to court that day. The trial court therefore noted on the record that "Miss Leonard [was] not available to testify."

¶ 41    The trial court then heard counsels' arguments on the motion. The State argued against posttrial counsel's contention that trial counsel had been ineffective for failing to call witnesses, pointing out that, even at the current hearing, one of the witnesses the defendant had wanted to call, Leonard, had not even bothered to show up. The State then emphasized that, despite "the attempts that the State made at securing" the witnesses' presence, "they didn't bother cooperating." The State also commented that it was "the [d]efendant's counsel's decision on what witnesses to call" at trial. Ultimately, the trial court denied the defendant's posttrial motion and supplemental filing on all points.

¶ 42    The trial court then proceeded to the sentencing hearing, during which it indicated that it had received and reviewed the PSI, two written victim impact statements, and four character letters submitted on the defendant's behalf. After that, Beaty's mother, father, sister, and wife all testified to the devastating impact Beaty's killing had on their lives and on Beaty's son. In aggravation, the State noted that the defendant discharged his weapon multiple times directly in the middle of Route 13, the main thoroughfare through Carbondale, as well as near St. Francis Xavier Church, on Easter Sunday. The State argued that it was the defendant's actions that killed Beaty, an innocent victim. The State acknowledged that, according to the PSI, the defendant was not "a bad kid," was going to college, and was raised without a father, although the State noted that the defendant had his mother, who raised him and his siblings by herself. Although the defendant claimed his acts were

19

justified, and the statements offered on his behalf characterized his actions as a mistake, the State disagreed and argued that they were conscious actions. The State noted that the defendant traveled from Missouri to Illinois with a loaded gun, took that loaded gun to a party, and then decided to repeatedly shoot at Greenlee.

¶ 43　In mitigation, the defendant's posttrial counsel contended that the defendant was a young man with no criminal history who had taken honor classes in high school and graduated in the top 30% of his class. The defendant played on a college football scholarship at Lane University before transferring to SEMO. At the time of the shooting, the defendant was studying business management because he hoped to own his own business one day. The defendant also hoped to start playing football again. He had four younger siblings for whom he deeply cared and functioned as a father figure. Defense counsel argued that the defendant "had no intention of killing someone that day, and there certainly was evidence of self-defense," although counsel acknowledged that the jury ultimately rejected that theory. Counsel also argued that evidence of provocation was presented through the fact that a bullet had been found near the marked church wall, and through testimony alleging that Greenlee had flashed his firearm, pushed from behind, and fired the first shot at the defendant.

¶ 44　Counsel argued that the defendant deserved leniency because he did not intend to kill anyone, but simply wanted to defend himself. Defense counsel further contended that the lesser included offenses merged into the felony murder conviction, and that the lesser convictions therefore had to be vacated. Counsel argued that there was hope for the defendant's rehabilitation because he had never been involved in anything like this before and was a "good seed" prior to this incident, as proven through his school records and background. Therefore, counsel asked that the lesser included crimes merge into the murder conviction, and that the trial court sentence the

20

defendant to 20 years' imprisonment based on the lack of aggravating factors and the presence of the following mitigating factors: that the defendant acted under a strong provocation, that there were substantial grounds tending to excuse or justify his criminal conduct, that he had no history of prior delinquency or criminal activity, that he led a law-abiding life before the incident, that his criminal conduct was the result of circumstances unlikely to reoccur, and that his character and attitude indicated that he was unlikely to commit another crime. The defendant then gave his statement in allocution expressing regret for his actions, asking for forgiveness, and pleading for a second chance. He indicated that he would use his second chance to help others going down the wrong path.

¶ 45    In making its sentencing decision, the trial court noted that it had considered the PSI; the written victim impact statements; the victim impact testimony from Beaty's family; the four character letters submitted on the defendant's behalf; the trial testimony and exhibits; the respectful way that the defendant always conducted himself in court; the defendant's background, upbringing, and accomplishments in life, in that he was a leader, made good grades, played sports, obtained a college scholarship to play football, was attending college at the time of the incident, and was attempting to better himself; his statement in allocution where he apologized for his actions; and counsels' arguments in aggravation and mitigation. The court also indicated that it had considered the relevant factors in aggravation, specifically the need to deter others.

¶ 46    As for factors in mitigation, the trial court noted that it had considered whether the defendant contemplated that his criminal conduct would cause or threaten serious physical harm to another, whether he acted under strong provocation in this particular situation, whether there were substantial grounds tending to excuse or justify his criminal conduct, the fact that he had no other criminal history, whether the criminal conduct was the result of circumstances unlikely to

21

reoccur, his character and attitude indicating that he was unlikely to commit another crime, and whether imprisonment would entail excessive hardship to his family, given that the defendant helped out with his younger siblings. On the first degree murder conviction, the trial court sentenced the defendant to 35 years' imprisonment with a mandatory sentence enhancement of 25 years. On the aggravated battery with a firearm conviction, the court sentenced the defendant to 15 years' imprisonment; and on both aggravated discharge of a firearm convictions, the court sentenced the defendant to 5 years' imprisonment per count (10 years total).

¶ 47 On July 25, 2018, the defendant filed a motion to vacate convictions and to reconsider sentences, arguing that (1) the trial court was obligated to vacate the three convictions on the felonies that served as the predicate felonies for the felony murder conviction and (2) the trial court should reconsider the defendant's sentence where the court improperly instituted a firearm sentence enhancement term, and where the sentence was excessive under the circumstances. In arguing excessive sentencing, the defendant named several "mitigating factors that were not adequately considered," including that the defendant had acted under strong provocation, that there were substantial grounds tending to excuse or justify his conduct, that he had a complete lack of criminal history, that he was sincerely remorseful, that he was unlikely to reoffend, and that he had a likelihood for rehabilitation. The motion failed to specifically identify and include any youth-based or *Miller*-based factors.[3]

¶ 48 At the September 4, 2018, hearing on the defendant's postsentencing motion, the State conceded that the predicate felonies for felony murder were considered lesser included offenses and had to be vacated. Defense counsel asked the trial court to reconsider the defendant's murder sentence, opining that he did "not recall aggravating factors that justified" the defendant's 35-year

---

[3]See *Miller v. Alabama*, 567 U.S. 460 (2012).

sentence, as opposed to the 20-year minimum. Defense counsel emphasized the mitigating factors of "strong provocation, substantial grounds tending to excuse or justify the [d]efendant's conduct, the [d]efendant's complete lack of criminal history, his sincere remorse, the unlikeliness of this reoccurring, and the likelihood for rehabilitation for this young man." Ultimately, the trial court vacated the aggravated battery with a firearm conviction and both aggravated discharge of a firearm convictions, but declined to retract the firearm sentencing enhancement term or otherwise reconsider the defendant's sentence on the first degree murder conviction. Thus, the defendant's amended sentence was 35 years' imprisonment for first degree murder, with the 25-year enhancement to be served consecutively. The trial court denied the defendant's motion on all other remaining claims. The trial court's written order finalizing this ruling was filed on October 17, 2018, and the defendant appealed to this court.

¶ 49    On direct appeal, this court affirmed the defendant's conviction and sentence where, *inter alia*, the defendant's trial counsel was not ineffective for failing to call certain witnesses as a matter of trial strategy, the sentencing enhancement instituted by the trial court was mandatory, and the trial court properly considered the sentencing factors in aggravation and mitigation. See *Tyler*, 2021 IL App (5th) 180476-U.

¶ 50    On October 14, 2022, the defendant, through his posttrial counsel, filed a postconviction petition, claiming actual innocence and ineffective assistance of trial counsel. Notably, the petition made no *Miller*-based claims or any claims surrounding excessive or improper sentencing.

¶ 51    The postconviction petition admitted that although trial counsel never called Leonard as a witness at trial, trial counsel did interview Leonard, who advised trial counsel "that she saw shooting in the direction of [the defendant] and that she heard bullets whizzing past her head as she attempted to escape." The petition explained that posttrial counsel had been unable to obtain

23

sworn testimony from Leonard until receiving her executed affidavit on September 27, 2022. The petition argued that trial counsel's failure to call witnesses who would have corroborated the defendant's testimony that he acted in self-defense was part of what constituted trial counsel's ineffective assistance of counsel. The petition also argued that Leonard's affidavit constituted "new, material, noncumulative and conclusive evidence of [the defendant's] innocence that would probably change the result of his case on retrial." Although the petition specifically asked that the court "grant [the defendant] sufficient time and leave to amend this petition to add additional claims *** as needed," the only items ultimately added to the petition were two exhibits: an affidavit from the defendant certifying that the statements in his postconviction petition were true and correct to the best of his knowledge, and another affidavit from the defendant regarding an aspect of his ineffective assistance of trial counsel claim which is not relevant to this appeal.

¶ 52    Leonard's affidavit stated that she was present at 402 West Walnut in Carbondale, Illinois, on March 27, 2016. She had initially come to Carbondale to attend a different party hosted by SIU students, but was denied entry at that party due to age restrictions. Leonard and her group of friends connected with other students and, after eating out at a restaurant, learned about the party at 402 West Walnut. She and her friends drove to the address and parked their cars alongside a church nearby. As they walked toward the entrance of 402 West Walnut, they observed several young men standing outside the house who seemed to be "standing guard." The men were standing side-by-side, and seemed to be intentionally blocking the entrance to the house. The men only partially moved out of their way as Leonard and her friends made their way into the party. As they passed the men, Leonard heard one of the men say to another that there were "too many Saint Louis mother****ers inside," and that they needed to "get all these mother****ers out of here." Leonard felt uncomfortable at the party and suggested to her friends that they leave. They left the party and

24

talked to some classmates standing in the church parking lot near their own cars, where Leonard and her friends had also parked.

¶ 53 A short while later, Leonard and her group "heard multiple gunshots and saw crowds of people trying to run out of the house through the front and rear entrance." Leonard instinctively ducked between the cars, and when she stood up, she "saw a man with a gun, shooting from the porch in the direction of the church[,]" where Leonard and many other students had gathered. As Leonard and her friends ran from the gunfire, they "heard bullets flying past [them] and hitting the side of the nearby church." After seeing that police had arrived on the scene, Leonard and her friends drove away from the area back to their campus in Missouri. Leonard admitted that she knew of the defendant, was aware that he attended her school (SEMO), and knew that he was from Saint Louis. Leonard attested to her belief that the defendant "discharged his firearm in self-defense, based on [her] observations of the party at 402 West Walnut, and the shooting that broke out there." Leonard confirmed that, had she been called to testify at the defendant's trial, her testimony would have been consistent with her affidavit. On November 14, 2022, the trial court advanced the defendant's postconviction petition to the second stage.

¶ 54 On March 24, 2023, the State filed a motion to dismiss the defendant's postconviction petition, arguing, *inter alia*, that because the defendant had already raised a claim of ineffective assistance of trial counsel in his direct appeal to this court, and this court had found that trial counsel was not ineffective, he was now barred by either *res judicata* or forfeiture from raising further ineffective assistance of trial counsel claims in his postconviction petition. Citing *People v. King*, 192 Ill. 2d 189, 192-93 (2000), the State asserted that the scope of postconviction review was limited "to constitutional matters which have not been, and could not have been, previously adjudicated." (Internal quotation marks omitted.) *Id*. Therefore, the State argued that the trial court

25

could not consider the defendant's ineffective assistance of trial counsel claim. Regarding the defendant's actual innocence claim, the State argued that Leonard's affidavit offered "no new, conclusive, or material evidence that would result in a different outcome on appeal[;]" specifically challenged the characterization of Leonard's affidavit as "new evidence" under the Act; and asserted that the evidence could have been presented on direct appeal, but was not, and was thus similarly barred by *res judicata* from postconviction consideration.

¶ 55    In his response to the State's motion to dismiss, the defendant asserted that his ineffective assistance of trial counsel claim was not barred from postconviction consideration because, although Griffin and McMiller did testify at posttrial proceedings, Leonard "did not testify at trial or posttrial proceedings[,]" and, as a result, the contents of her affidavit "could not have been included in the record on [direct] appeal." Despite arguing that trial counsel was ineffective for not calling Leonard as a witness at trial, the defendant made a conflicting argument of actual innocence regarding Leonard's affidavit, asserting that her affidavit was newly discovered because the defendant could not have discovered it sooner through due diligence. The defendant resolved this contradiction by explaining that, although his trial counsel could have interviewed Leonard, trial counsel's failure to do so had "nothing to do with" the defendant's due diligence. Finally, the defendant noted that Leonard's affidavit had not been able to be obtained until September 27, 2022.

¶ 56    Thereafter, the State filed an amended motion to dismiss, and the defendant filed a response to the State's amended motion. As nothing relevant to this appeal was added or changed in either filing, we will not discuss their contents further.

¶ 57    On December 29, 2023, the trial court issued an order granting the State's amended motion to dismiss the defendant's postconviction petition at the second stage. In the order, the trial court

determined that (1) the defendant's ineffective assistance of trial counsel claims were either raised and decided in his direct appeal, or could have been raised and decided there, and were therefore barred by either *res judicata* or forfeiture and (2) Leonard's affidavit was not "newly discovered." The trial court commented that, although the defendant's petition admitted that "[t]he evidence in [Leonard's] affidavit was *** known to [the] defendant at the time of the trial," it failed to explain why the defendant could not have obtained Leonard's testimony at that time through due diligence. The trial court thus dismissed the defendant's postconviction petition. The record confirms that the defendant's posttrial counsel did not file a certificate under Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). The defendant appeals.

¶ 58                                II. ANALYSIS

¶ 59     On appeal, the defendant argues that this court should reverse the trial court's second-stage dismissal of his postconviction petition and remand for a third-stage evidentiary hearing where the defendant made a substantial showing of actual innocence. Alternatively, the defendant argues that this court should reverse and remand for new second-stage proceedings with new counsel where the defendant was denied his right to reasonable assistance of postconviction counsel because his posttrial counsel, who also represented him in postconviction matters prior to this appeal, failed to substantially comply with Rule 651(c).

¶ 60                              A. Actual Innocence

¶ 61     The defendant argues that the trial court erred in dismissing his postconviction petition at the second stage because he made a substantial showing of actual innocence where Leonard's affidavit was newly discovered, material and noncumulative, and of such conclusive character that it was likely to change the result on retrial. We disagree.

27

¶ 62    The Act (725 ILCS 5/122-1 *et seq.* (West 2022)) provides a statutory remedy to criminal defendants who assert claims for substantial violations of their constitutional rights at trial. *People v. Robinson*, 2020 IL 123849, ¶ 42. Under the Act, a postconviction proceeding consists of three stages. *People v. Johnson*, 2018 IL 122227, ¶ 14. At the first stage, the trial court, without input from the State or further pleadings from the defendant, must independently review the postconviction petition and determine whether it is "frivolous or is patently without merit." (Internal quotation marks omitted.) *Id.*; 725 ILCS 5/122-2.1(a)(2) (West 2022). If the court determines that the petition is frivolous or patently without merit, the court must dismiss the petition at this stage. *Johnson*, 2018 IL 122227, ¶ 14. If, however, the petition is not dismissed at this stage, then it advances to the second stage, where the State is permitted to file responsive pleadings. *Id.* ¶¶ 14-15; 725 ILCS 5/122-2.1(b) (West 2022). At this stage, the court must determine whether the petition, along with any accompanying documentation, make a substantial showing of a constitutional violation. *Id.* ¶ 15, citing *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). Our supreme court has held that, at this stage, the trial court is foreclosed from engaging in any fact-finding, and that all well-pleaded facts are to be taken as true. *People v. Coleman*, 183 Ill. 2d 366, 380-381. If the defendant successfully makes a substantial showing of a constitutional violation at this second stage, then the petition advances to a third-stage evidentiary hearing. *Johnson*, 2018 IL 122227, ¶ 15. However, if no such showing is made, then the petition is dismissed. *Id.* The second-stage dismissal of a postconviction petition is subject to *de novo* review. *People v. Sanders*, 2016 IL 118123, ¶ 31. Here, the defendant challenges the trial court's second-stage dismissal of his postconviction petition by asserting that the trial court erred in finding that he had failed to make a substantial showing of the actual innocence claim asserted in his petition.

28

¶ 63    Our supreme court has held, as a matter of Illinois constitutional jurisprudence, that a claim of newly discovered evidence showing a defendant to be actually innocent of the crime for which he was convicted is cognizable as a matter of due process and a substantial violation of his constitutional rights. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). In order to make a substantial showing of actual innocence at the second stage of proceedings under the Act, the offered evidence, taken as true, must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *Sanders*, 2016 IL 118123, ¶ 24. Newly discovered evidence is evidence that was discovered after the trial and that could not have been discovered earlier through the exercise of due diligence. *Robinson*, 2020 IL 123849, ¶ 47. Evidence is material if it is relevant and probative of defendant's innocence. *Id.* Noncumulative evidence adds to the information that the fact finder heard at trial. *Id.* The conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. *Id.* This last element is the most important element of an actual innocence claim. *Id.* The ultimate question for an actual innocence claim is whether the newly discovered evidence places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. *Id.* ¶ 48. The new evidence need not be entirely dispositive to be likely to alter the result on retrial. *Id.* Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the trial evidence along with the new evidence. *Id.*

¶ 64    In this case, the trial court found that the defendant failed to make a substantial showing of actual innocence where Leonard's affidavit was not "newly discovered." Here, we need not address whether the affidavit could have been discovered earlier in the exercise of due diligence or whether it is material and noncumulative because we find that, even assuming those conditions

29

have been satisfied, the evidence is not of such conclusive character that it would probably change the result on retrial. See *Sanders*, 2016 IL 118123, ¶ 47.

¶ 65    At trial, the only substantial evidence, other than the defendant's own testimony, suggesting that the defendant shot at the Sigma House in self-defense, was Officer Ital's testimony that he had found a bullet on the ground about eight feet back from the church wall, and observed a bullet strike marking approximately five feet up on that church wall. Even so, Officer Ital could not confirm anything more than that the bullet could possibly have come from 334 or 402 West Walnut.

¶ 66    According to Detective Weisenberger, the bullet from the church area was the first evidence collected indicating that gunfire had been directed south. Officers Stewart and Moorman both admitted that they had not searched for evidence by the church or along the church wall upon being dispatched to the Sigma house for the shooting. Officer Ital, who found the lone church bullet, admitted that his department could have missed other markings and bullets in the church area. Sergeant Williams admitted that he never asked any witnesses about the bullet strike marking on the church wall or about whether there was gunfire going in the direction of the church, although he did ask witnesses about the shooting they had observed that night generally. Sergeant Williams also denied that the bullet strike marking necessarily conflicted with the information he had obtained from witnesses. Detective Weisenberger acknowledged that no witness told him about gunfire going toward the south, and testified that he did not believe anyone from his office had intentionally talked with witnesses about the church evidence. Sergeant Geissler testified that, although he investigated claims that individuals to the north side of West Walnut Street were holding firearms during the shooting, he was unable to find any evidence corroborating those claims.

30

¶ 67    With regard to other ballistic evidence found, after being dispatched for the shooting, Trooper Harsy observed a loaded handgun magazine on the floor near the Sigma house's brick fireplace, as well as a live .40 caliber cartridge on the fireplace ledge. Detective Stewart and Officer Mooney, who were also dispatched just after the shooting, found 15 shell casings and one live round in the intersection of West Walnut and South Beveridge. Between 402 and 334 West Walnut, they found a partially loaded magazine, and in front of 322 West Walnut, they found a shell casing different from the others previously found. However, both Stewart and Mooney acknowledged that the ballistic evidence they had found could have been moved from their original position in the chaos after the shooting.

¶ 68    Dominique White, a student who had attended the Sigma party, testified that she did not see anyone shooting on the north side of West Walnut, but did see someone in a black outfit shooting from the crowd across the street from the Sigma House. Joshua Bell, Greenlee's friend and a student attending the Sigma house party, testified that he saw two individuals shooting toward the house from across the street, and identified one of the individuals as the defendant. Bell explicitly denied ever seeing Greenlee having or shooting a gun that night.

¶ 69    Additionally, the only recollection of the encounter between Greenlee, Jones, and the defendant that differed significantly from the others was that of the defendant's. While the defendant testified that Greenlee had shown him a revolver in his waistband after they got into an altercation, both Jones and Greenlee testified that it was the defendant who had reached for his waist as though he had a gun. Although Jones testified that he saw the handle of a gun at that point, Greenlee testified that he did not, and thus thought the defendant was pretending. While the defendant testified that Greenlee had initiated the shooting by firing twice in the defendant's direction, both Jones and Greenlee testified that it was the defendant who began shooting from

31

across the street in their direction, the direction of the Sigma house. In fact, while both Jones and Greenlee explicitly denied ever having or shooting a gun that night, the defendant admitted being armed with a fully loaded Glock and shooting in the direction of the Sigma house until his magazine was empty.

¶ 70　While John Ingram, the defendant's prior codefendant, recollected seeing a man with a revolver in front of the Sigma house door, he also recollected seeing an individual only feet away from him on his side of the street shooting in the direction of the Sigma house. Ingram denied seeing anyone point a gun at him, and did not remember whether anyone fired in his direction. As he ran to his vehicle, Ingram noticed the defendant running as well, and he saw that the defendant had a gun in his hand.

¶ 71　At a posttrial hearing, Anthony Griffin, the defendant's cousin, testified that as he ran across the street from the Sigma house, he saw bullets "ricocheting" off the ground and heard gunshots. Griffin saw two shooters firing toward the church parking lot, both on the north side of the street near the Sigma house. Despite knowing that the defendant had been jailed and charged with first degree murder, Griffin never called the police or the defendant's counsel prior to trial. At the same posttrial hearing, Lena McMiller, another of the defendant's cousins, testified that, although she did not see anyone holding a gun that night, she was sure that "a lot" of gunshots were being fired in her direction near the church parking lot. As she ran to her vehicle, a bullet flew past her and hit the church wall. McMiller did not testify at trial because she had not been served or asked to come to court at that time.

¶ 72　In her affidavit, the only evidence the defendant attached to his postconviction petition in support of his actual innocence claim, Leonard stated that, as she passed the men at the Sigma house's front door to enter the party, she heard them speak disdainfully about how there were too

many attendees from St. Louis. Leonard "felt uncomfortable" at the party and left shortly thereafter, walking across the street to the church parking lot. When the shooting started, Leonard saw, from where she was standing near the church, a man with a gun firing from the Sigma house porch in the church's direction. As Leonard ran from the gunfire, she heard bullets hitting the side of the church. Leonard denied knowing anything more about the defendant than his name, that he also attended SEMO, and that he was from St. Louis. Leonard's affidavit concluded by stating her belief that the defendant had fired in self-defense. Leonard never testified at either trial or posttrial proceedings.

¶ 73　　To find that the defendant made a substantial showing of actual innocence at the second stage, we must be able to find that Leonard's affidavit is so conclusive that it is more likely than not to change the result on retrial. Upon *de novo* review, after reviewing Leonard's affidavit alongside the overwhelming evidence against the defendant, we are unable to make such a conclusion here. Therefore, we find that the trial court did not err in dismissing the defendant's postconviction petition at the second stage.

¶ 74　　　　　　　　　　B. Illinois Supreme Court Rule 651(c)

¶ 75　　The defendant next argues that this court should reverse and remand for new second-stage proceedings with new counsel where he was denied his right to reasonable assistance of postconviction counsel because his posttrial counsel, who also represented him in postconviction matters prior to this appeal, failed to substantially comply with Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). The defendant does not assert that posttrial counsel failed to consult with the defendant or examine the record; rather, the defendant asserts only that counsel failed to make necessary amendments to the petition.

¶ 76    The proportionate penalties clause in the Illinois constitution provides greater protection regarding sentences than the eighth amendment to the federal constitution, in that the Illinois constitution requires that penalties be determined "with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates this clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." (Internal quotation marks omitted.) *People v. Hilliard*, 2023 IL 128186, ¶ 20. A sentence of "any length" can violate the clause. *Id.* ¶ 29. Although recent decisions of our supreme court have limited *Miller*-based eighth amendment challenges for emerging adults, they have not foreclosed emerging adults from raising as-applied sentence challenges under the proportionate penalties clause of the Illinois Constitution. *People v. Williams*, 2024 IL 127304, ¶ 29. Such as-applied challenges remain viable for emerging adults who can present evidence that their brains were like juvenile brains at the time of the offense. *People v. Harris*, 2018 IL 121932, ¶¶ 45-46; *People v. Thompson*, 2015 IL 118151, ¶¶ 38-40. Here, the defendant, who was 21 years old at the time of the offense, claims that such an as-applied emerging adult sentencing challenge under the Illinois proportionate penalties clause was "readily apparent" on the face of the record, and that his posttrial counsel was therefore obligated under Rule 651(c) to either include the claim in his postconviction petition, or to adequately amend the petition to save it from forfeiture. In not doing either, the defendant claims that posttrial counsel failed to comply with Rule 651(c), thus providing unreasonable assistance of counsel. We disagree.

¶ 77    At the outset, we first consider whether Rule 651(c) is applicable in the defendant's case. As the right to counsel in postconviction proceedings is wholly statutory, postconviction defendants are only entitled to the level of assistance provided by the Act. See 725 ILCS 5/122-4 (2022); *People v. Turner*, 187 Ill. 2d 406, 410 (1999). It is well settled that the Act requires counsel

34

to provide a reasonable level of assistance to a defendant in postconviction proceedings. *Turner*, 187 Ill. 2d at 410. Rule 651(c) is one such "vehicle for ensuring a reasonable level of assistance[,]" but it is not applicable to all postconviction cases. *People v. Anguiano*, 2013 IL App (1st) 113458, ¶ 37. In fact, Rule 651(c) compliance is only required where the defendant's initial postconviction petition was filed *pro se*. See *People v. Cotto*, 2016 IL 119006, ¶ 41; see also *People v. Mitchell*, 189 Ill. 2d 312, 358 (2000); and *People v. Richmond*, 188 Ill. 2d 376, 383 (1999). Indeed, our supreme court has repeatedly made it clear over the years that "where private counsel is retained and files the [initial] postconviction petition, postconviction counsel need not comply with Rule 651(c) [citation] but must still perform reasonably." *People v. Smith*, 2022 IL 126940, ¶ 32; *People v. Urzua*, 2023 IL 127789, ¶ 24.

¶ 78    Here, the defendant filed his initial postconviction petition through his posttrial counsel, who also represented him in postconviction matters prior to this appeal. As the defendant's initial postconviction petition was not filed *pro se*, posttrial counsel could not have violated the provisions of Rule 651(c).

¶ 79    However, even where Rule 651(c) is inapplicable, all postconviction petitioners who are "represented by counsel in proceedings under the Act [are] entitled to a reasonable level of attorney assistance. [Citation.] This is true whether the attorney is appointed or retained and whether the proceedings are at the first, second, or third stage." *Urzua*, 2023 IL 127789, ¶ 51. As "our case law does not treat Rule 651(c) as the exclusive mechanism for ensuring reasonable assistance[,]" we may evaluate whether reasonable assistance of counsel was provided without reference to Rule 651(c). *Smith*, 2022 IL 126940, ¶ 25.

¶ 80    We thus turn to evaluating whether the defendant's posttrial counsel, who also represented him in postconviction matters until this appeal, provided unreasonable assistance in failing to

either add an emerging adult proportionate penalties claim to the petition, or to adequately amend the petition to save the claim from forfeiture. The defendant's arguments, which we address in turn, "present questions of law that we review *de novo*." *People v. Cotto*, 2016 IL 119006, ¶ 24.

¶ 81                                    1. *Duty to Add Claim*

¶ 82    The defendant first contends that the providing of reasonable assistance includes a duty to bring claims that are readily apparent on the face of the record, and asserts that, here, an emerging adult proportionate penalties claim was such a claim. Even if we were to accept the contention that the providing of reasonable assistance requires counsel to bring claims readily apparent on the face of the record, we do not find that the defendant's emerging adult proportionate penalties claim was such a readily apparent claim. Where a defendant simply cites his age at the time of the offense and the evolving science on juvenile maturity and brain development, without offering something more demonstrating how that science applied to the particular circumstances of his case, he does not sufficiently make an as-applied claim that a sentence violates the proportionate penalties clause of the Illinois Constitution. See *Thompson*, 2015 IL 118151, ¶ 38; see also *Williams*, 2024 IL 127304, ¶¶ 30-31.

¶ 83    Here, the only evidence tending to show that the defendant had a basis to argue that he had an immature brain was the fact that he was 21 at the time of the crime. Science on juvenile maturity and brain development was not offered into evidence at any point during trial or posttrial proceedings. However, there was significant evidence demonstrating the defendant's maturity and development at the time of the crime. At the sentencing hearing, defense counsel described the defendant as a young man with no criminal history who had taken honor roll classes in high school and graduated in the top 30% of his class; played on a college football scholarship; studied business management in hopes of owning his own business one day; and functioned as a father figure for

36

his four younger siblings. Therefore, an emerging adult proportionate penalties claim would not have been readily apparent on the face of the record here. Upon *de novo* review, we find that postconviction counsel did not provide unreasonable assistance by not adding an emerging adult proportionate penalties claim to the petition.

¶ 84                                 2. *Duty to Save Claim from Forfeiture*

¶ 85    Next, the defendant alleges that counsel failed to provide reasonable assistance where counsel failed to adequately amend the petition to save the emerging adult proportionate penalties claim from forfeiture. We first determine whether the claim was in fact forfeited. The defendant asserts that the emerging adult proportionate penalties claim was forfeited where it was not argued on direct appeal, and that, therefore, in order to provide reasonable assistance, postconviction counsel was required to save the claim from forfeiture by alleging ineffective assistance of appellate counsel in the petition.

¶ 86    Generally, a claim is forfeited on direct appeal if it could have been raised there but was not. See *People v. Tate*, 2012 IL 112214, ¶ 8. However, the doctrine of forfeiture is relaxed "where the facts relating to the issue do not appear on the face of the original appellate record." *People v. English*, 2013 IL 112890, ¶ 22. Here, as we have explained above, there was no evidence or argument in the record, except the bare fact of the defendant's age of 21 years, to suggest a possible emerging adult proportionate penalties claim, or that such a claim would have had any merit or viability. Such a claim, therefore, was not conclusively forfeited on direct appeal. Additionally, postconviction counsel had no obligation to preserve a claim from forfeiture which did not have a basis in the record or a prospect of success. Upon *de novo* review, we find that the defendant was provided reasonable assistance of postconviction counsel.

¶ 87                        III. CONCLUSION

¶ 88    The defendant failed to make a substantial showing of his actual innocence claim at the second stage of proceedings under the Act. Additionally, the defendant was provided reasonable assistance of postconviction counsel. Accordingly, we affirm the trial court's dismissal of the defendant's postconviction petition at the second stage.


¶ 89    Affirmed.